In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-2187

LESTER GAYTON,

*Plaintiff-Appellant*,

*v.*

MICHAEL D. MCCOY, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 04 CV 1354—**Byron G. Cudmore**, *Magistrate Judge*.

ARGUED MAY 7, 2009—DECIDED JANUARY 28, 2010

Before FLAUM and WILLIAMS, *Circuit Judges*, and
LAWRENCE, *District Judge*.[*]

WILLIAMS, *Circuit Judge*. India Taylor, a thirty-four-year-old recent college graduate, entered Peoria County Jail on October 15, 2003 complaining of chest pain. Despite

_____

[*] The Honorable William T. Lawrence, United States District Court Judge for the Southern District of Indiana, sitting by designation.

knowledge that Taylor had a serious heart condition and elevated blood pressure, she was never provided with any medication and, against the jail's written protocol, a doctor was never contacted to examine her. Less than three days later, she was dead due to non-specific heart failure brought on by an elevated pulse. Her estate's executor brought suit against the three nurses who examined Taylor, claiming that they violated her due process rights by failing to provide her with adequate medical care. The plaintiff also brought suit against a variety of prison officials, claiming that inadequate prison medical policies contributed to Taylor's untimely death.

The district court excluded the plaintiff's expert witness, Dr. Corey Weinstein, finding that he was unqualified and that his opinions were not reliable. It also granted summary judgment to the defendants after determining that none of them exhibited a deliberate indifference to a serious medical need of Taylor's. Because Dr. Weinstein conceded that he has no specific training or education regarding the short-term efficacy of Taylor's heart medications, we affirm the district court's exclusion of his opinion that she might have survived if prison officials had provided her with these medications in the days before her death. However, Dr. Weinstein's medical training, examination of Taylor's medical records, and use of differential diagnosis support his conclusion that the nurses' failure to quell Taylor's vomiting could have led to her tachycardia, and his opinion on this issue should have been admitted. Likewise, his examination of the record

in this case coupled with being one of the leading experts on prison medical care support his conclusion that the jail officials did not provide Taylor with the minimum standard of prison medical care expected in this country, and to the extent that it remains relevant at trial, it should be admitted.

The district court was correct that, as the plaintiff conceded at oral argument, the prison's medical policies were adequate and therefore did not contribute to Taylor's death. So, the district court properly awarded summary judgment to Peoria County, Advanced Correctional Healthcare, Inc., and the individual defendants who did not have contact with Taylor during her incarceration. As to the nurses, although she failed to follow prison protocol in treating Taylor, Nurse Olivia Radcliff took steps to obtain Taylor's cardiac medications and put a note in Taylor's file to have her seen by a doctor if the medications were not delivered. So, it cannot be said that she acted with deliberate indifference, and the district court correctly granted summary judgment in her favor. Taylor visited Nurse Patricia Mattus complaining of nausea, and, because she thought Taylor was drug seeking, Nurse Mattus did not provide Taylor with any medication, put her on the sick call list, and sent her back to her cell. Because Taylor did not complain of chest pain during the visit, however, Nurse Mattus was not faced with a serious medical need that required immediate treatment. So, the district court properly granted summary judgment in her favor.

On the other hand, Nurse Pam Hibbert was presented with ample evidence that Taylor needed medical treat-

ment. While participating in a video-bond hearing, Taylor began to vomit. The guards were so concerned about Taylor's condition that they collected her vomit in a bag and immediately called Nurse Hibbert requesting that she examine Taylor. Nurse Hibbert knew about Taylor's heart condition, and if per prison protocol, she examined Taylor's chart, she would have seen that her cardiac medications should have been delivered, that she had recently complained of chest pain, that she had high blood pressure less than twenty-four hours earlier, and that she should have already been examined by a doctor. But instead of calling a doctor or examining Taylor, Nurse Hibbert concluded that Taylor was drug seeking, and told the guards that her shift was coming to an end. Based on these facts, a jury could find that Nurse Hibbert was deliberately indifferent to Taylor's serious medical need, and that Nurse Hibbert's inaction caused Taylor to suffer harm. Therefore, we reverse and remand this matter for trial against Nurse Hibbert.

## I. BACKGROUND

In April 2003, thirty-four-year-old India Taylor's doctors diagnosed her with congestive heart failure ("CHF"). CHF is a serious heart condition characterized by a swelling on the lining surrounding the heart, which weakens the heart and impairs the heart's ability to pump blood to the body's organs. Taylor's doctors prescribed a regimen of six medications, generally consisting of diuretics and ACE inhibitors. They also informed her that she had a mortality risk of forty to sixty percent

if she failed to take her medications on a consistent basis, but less than ten percent if she took them as instructed. Over the course of the next few months, Taylor took her medications sporadically and missed several doctors' appointments.

On July 1 and July 17, 2003, respectively, Taylor was arrested. During both arrests, Taylor complained of chest pain and was transported to the emergency room. Both times, doctors provided her with her prescribed CHF medications, after which she was taken to Peoria County Jail ("PCJ"). When Taylor arrived at PCJ on July 2, 2003, Nurse Patricia Mattus made contact with Taylor's doctors to ascertain her medical history. This history and a list of Taylor's necessary medications became a part of Taylor's medical records at PCJ. During her second incarceration, Taylor vomited violently as a result of heroin withdrawal. The medical staff treated her with Donnatal (to calm her nausea) and Vistaril (a sleep aid).

On July 20, 2003, the day after she was released from her second detention at PCJ, Taylor went to the emergency room complaining of chest pain. She presented with an elevated blood pressure, and her doctors prescribed thirty days' worth of CHF medications with an additional refill. Walgreens's records show that she filled these prescriptions shortly after she was released from the emergency room.

On August 2, 2003, Taylor was arrested again. This time she had her medications with her. Dr. Norman Johnson, a prison physician, examined her and recommended that she continue taking her CHF medications

while incarcerated. Dr. Johnson is employed as president and CEO of Advanced Correctional Healthcare, Inc., a private, for-profit company that provides medical care in prisons, including PCJ. During Taylor's month-long incarceration at PCJ, she did not suffer from heroin withdrawal and did not vomit. She was released on August 28, 2003.

October 15, 2003, Taylor was arrested again and detained at PCJ. During the booking process, she complained of chest pain. After she was processed, the guards took her to medical intake. During intake, Nurse Olivia Radcliff examined Taylor. Taylor completed a medical questionnaire, on which she listed her treating physician and medications. Nurse Radcliff acknowledged that the jail had copies of Taylor's medical records and knew of the medications that she was prescribed to treat her CHF. The back of the form, on which the nurse was supposed to record her observations and findings, has never been found.

Nurse Radcliff checked Taylor for head lice but did not take her vital signs. Taylor called her brother, Lester Gayton, and asked him to refill her medications and bring them to PCJ. Nurse Radcliff made a note on Taylor's chart that if the medications were not brought to the prison by the following day, Taylor was to be seen by Dr. Johnson.

Gayton could not retrieve Taylor's prescriptions due to complications with her insurance, but failed to inform the jail that he would not be delivering the medications. Around 4:30 A.M. the next morning (October 16),

Taylor complained to the guards of nausea and told them that she was suffering from heroin withdrawal. The guards saw her vomit and took her to see Nurse Mattus. Taylor requested drugs to help her stop vomiting, but Nurse Mattus concluded that Taylor must have forced herself to vomit in order to receive drugs and refused to provide her with medication to reduce her vomiting. Nurse Mattus also claimed that she was unable to take Taylor's vitals and sent her back to her cell after putting her on the sick call list to be seen later that morning.

Around 9 A.M. that same morning, Nurse Pam Hibbert saw Taylor during PCJ's sick call. Taylor's blood pressure was elevated and she complained of nausea. Nurse Hibbert sent Taylor back to her cell. During Taylor's video-bond hearing at 3 P.M., Taylor vomited violently. The guards were worried about her condition. They collected her vomit in a plastic bag and called Nurse Hibbert. Nurse Hibbert told the guards that she thought Taylor was seeking drugs, refused to allow the guards to bring Taylor in for an examination, and stated that Taylor should just fill out a sick request form in order to be seen by the next nurse because Hibbert's shift was almost over (Nurse Mattus took over at 8 P.M.). The officers took the sick request form to Taylor and helped her fill it out. Taylor said she was feeling better, but she completed the form, which the guards submitted for her at 7:40 P.M. This request form was also never found. One of the officers filed a jail incident report against Nurse Hibbert because she thought that Nurse Hibbert ignored a significant medical complaint.

Taylor was on the list of prisoners to be seen by Dr. Johnson the next morning. However, sometime before 3:40 A.M. on the morning of October 17, Taylor died. Taylor's brother and administrator of her estate, Lester Gayton, initiated this wrongful death action pursuant to 42 U.S.C. § 1983 against the Sheriff who administers PCJ, PCJ's superintendent, Advanced Correctional Health Care, the three nurses who examined Taylor, and Dr. Johnson.

There are three medical opinions at issue in this case. Dr. Brian Mitchell, a pathologist at the coroner's office, concluded that Taylor died of heart failure. The defendants' expert, Dr. Kreigh Moulton, a board-certified cardiologist, testified that Taylor died of heart failure as a result of "sustained ventricular tachyarrhythmia in the setting of a chronic nonischemic cardiomyopathy." "Tachyarrhythmia" or "tachycardia" simply refers to a pulse that reaches over 100 beats per minute. Essentially, Dr. Moulton concluded that Taylor had a weak heart, her pulse elevated while in prison, and her heart failed for non-specific reasons. Dr. Corey Weinstein, the plaintiff's expert, adopted the other two experts' cause of death findings and opined that: (1) had Taylor been given her cardiac medications while in prison, she might still be alive; (2) the combination of Taylor's vomiting and diuretic medications could have caused electrolyte imbalances (due to depleted potassium levels), which could have led to her tachycardia and then her heart failure; and (3) prison medical officials departed from accepted standards of prison medical care in their treatment, or lack thereof, of Taylor. Dr. Moulton refuted

Dr. Weinstein's findings and concluded that: (1) Taylor's cardiac medication would not have prevented her death; and (2) although severe vomiting could contribute to tachyarrhythmia, it would take almost a full day of vomiting before her electrolyte levels were sufficiently depleted to do so.

The district court excluded Dr. Weinstein's testimony and entered summary judgment for the defendants, finding that the plaintiff failed to show proximate causation or that any defendant acted indifferently to a serious medical need. The plaintiff now appeals.

## II. ANALYSIS

### A. The Exclusion of Dr. Weinstein's Testimony

Federal Rule of Evidence 702 allows an expert witness to testify about a relevant scientific issue in contention if his testimony is based on sufficient data and is the product of a reliable methodology correctly applied to the facts of the case. Under the *Daubert* framework, the district court is tasked with determining whether a given expert is qualified to testify in the case in question and whether his testimony is scientifically reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990). In determining reliability, *Daubert* sets forth the following non-exhaustive list of guideposts:

(1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; and (3) whether the theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94. The court should also consider the proposed expert's full range of experience and training in the subject area, as well as the methodology used to arrive at a particular conclusion. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). We give the district court latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable, *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007), but the court must provide more than just conclusory statements of admissibility or inadmissibility to show that it adequately performed its gatekeeping function. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006). Determinations on admissibility should not supplant the adversarial process; "shaky" expert testimony may be admissible, assailable by its opponents through cross-examination. *See Daubert*, 509 U.S. at 596. We review de novo whether the court correctly applied *Daubert*'s framework, and we review the court's decision to admit or exclude expert testimony for abuse of discretion. *Kunz v. DeFelice*, 538 F.3d 667, 675 (7th Cir. 2008).

In this case, the district court found that: (1) Dr. Weinstein was not qualified[1] to testify regarding

---

[1] Dr. Weinstein's qualifications include, among other things: a medical degree from the University of Illinois College of

(continued...)

Taylor's "cause of death"; and (2) the methodology he
used to arrive at his conclusions was not sufficiently
reliable. The district court reasoned that Dr. Weinstein
was not qualified to opine on Taylor's cause of death
because he was neither a cardiologist nor pharmacologist,
had no specific expertise on heart disease, and did not
possess any training regarding the interactions of Taylor's
prescriptions and tachycardia. In its analysis, the district
court made a fundamental mistake in characterizing
Dr. Weinstein's testimony as "cause of death" testimony.
Dr. Weinstein did not testify as to what caused Taylor's
death. All three experts agreed that Taylor died as a
result of nonspecific heart failure due to an increased
heart rate, the cause of which cannot be known for cer-
tain. Dr. Weinstein did not dispute this. Instead, he offered
his opinion that Taylor's death could have been prevented
if: (1) she had been given her CHF medications; (2) she had
been treated to stop her vomiting; or (3) she had received
adequate medical treatment from the medical professionals
at PCJ. Dr. Weinstein's qualifications for making, and
methodology in reaching, each of these conclusions must
be separately examined.

---

[1] (...continued)
Medicine (1969), treating patients as a general practitioner for
over thirty years, spending a significant amount of his time
consulting on medical care in prisons, many prior legal con-
sultations regarding prison medical care, certification by the
National Commission on Correctional Health Care, member-
ship in the American Public Health Association, being
Chairman of the Jail and Prison Health Committee, and mem-
bership in the International Human Rights Committee.

Before turning to Dr. Weinstein's individual conclusions, it is important to address the district court's assumption that Dr. Weinstein needed to have specific cardiac training to testify as an expert in a case involving a heart-related death. True, simply because a doctor has a medical degree does not make him qualified to opine on all medical subjects. *See Carroll,* 896 F.2d at 212. That said, courts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats. 29 Wright & Gold, Federal Practice and Procedure, § 6265 (1997); *see Doe v. Cutter Biological, Inc.,* 971 F.2d 375, 385 (9th Cir. 1992) ("The fact that the experts were not licensed hematologists does not mean that they were testifying beyond their area of expertise. Ordinarily, courts impose no requirement that an expert be a specialist in a given field, although there may be a requirement that he or she be of a certain profession, such as a doctor."); *see also Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.,* 388 F.3d 976, 978-79 (6th Cir. 2004); *United States v. Viglia,* 549 F.2d 335, 336 (5th Cir. 1977) (holding that a pediatrician who had degrees in medicine and pharmacology but no experience in treating patients for obesity had sufficient knowledge, training, and education to testify regarding drug's effect on obese persons). The question we must ask is not whether an expert witness is qualified in general, but whether his "qualifications provide a foundation for [him] to answer a specific question." *Berry v. City of Detroit,* 25 F.3d 1342, 1351 (6th Cir. 1994); *see Meridia Prod. Liab. Litig. v. Abbott Lab.,* 447 F.3d 861, 868 (6th Cir. 2006) (district court did not abuse its discretion by

permitting qualified pharmacologist to testify as to drug temporarily elevating blood pressure of some patients, but not as to effects of high blood pressure on the human body.); *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002). So, the fact that Dr. Weinstein is not a cardiologist does not prevent him from testifying regarding Taylor's death; instead, we must look at each of the conclusions he draws individually to see if he has the adequate education, skill, and training to reach them.

Here, Dr. Weinstein makes three separate conclusions. With respect to his first conclusion, that Taylor would not have died if PCJ had given her her cardiac medications, the district court did not abuse its discretion in finding him unqualified because of his lack of specific knowledge of cardiology and pharmacology. Aside from the fact that these drugs treat heart disease and that they were prescribed for Taylor's CHF, Dr. Weinstein gives no basis for his opinion that if prison officials had obtained and administered these medicines to her during the two days prior to her death she would have survived. Dr. Weinstein does not contend that he has any specific knowledge regarding how these drugs function, whether they are efficacious in the short term as well as the long term, or how they prevent CHF from reaching a critical stage. Moreover, Dr. Weinstein cannot state what effect, if any, these medications would have had given that the record reveals that Taylor had not been taking them consistently nor as instructed by her prescribing physician. Because he does not have specialized cardiac or pharmaco-

logical knowledge upon which to base his conclusion that these drugs had a reasonable probability of saving her life if taken in the days before her death, the district court did not err in excluding it.

On the other hand, Dr. Weinstein's second conclusion, that Taylor's vomiting combined with her diuretic medications may have contributed to her tachycardia and subsequent death, should not have been excluded. The effects of vomiting on potassium and electrolyte levels in the body is not specialized knowledge held only by cardiologists, and as Dr. Weinstein opined, it is knowledge that any competent physician would typically possess. So, the district court erred when it concluded that Dr. Weinstein was not qualified to testify that Taylor's vomiting may have hastened her death.

The district court did not address Dr. Weinstein's third conclusion, that the care given to Taylor did not meet the acceptable standards of prison medicine and that the standard level of care may have prevented her death. It is undisputed that Dr. Weinstein is an expert in the area of prison healthcare. So, to the extent that it remains relevant, given that Dr. Weinstein's testimony regarding PCJ's or the individual defendants' failure to provide an adequate standard of medical care to Taylor resulted in an injury to her could "assist the trier of fact to understand the evidence or to determine a fact in issue," it should be admitted. *See* Fed. R. Evid. 702.

The district court also excluded Dr. Weinstein's testimony because it found it to be unreliable. Specifically, the court took issue with the fact that: (1) Dr. Weinstein simply adopted the cause of death proffered by the

other physicians; and (2) he did not specifically rule out any other possible contributing factors to Taylor's death. As stated above, none of the experts in this case can definitively say that one specific factor caused Taylor's heart to stop. Dr. Weinstein simply posited that a large amount of vomiting was one factor that increased the likelihood that Taylor's heart would fail. To the extent that this amounts to "adopting the cause of death" finding of another expert, we see no problem with it. In terms of his methodology, Dr. Weinstein, like Dr. Moulton, had to arrive at his conclusions based solely on an examination of a cold record, consisting of Taylor's autopsy report, her medical records, and the testimony of the prison guards and other witnesses. *Cf. Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000) ("[I]n clinical medicine, the methodology of physical examination and self-reported medical history employed by [the physician] is generally appropriate."). In reviewing the record, Dr. Weinstein used the same type of equally reliable analysis as Dr. Moulton—differential diagnosis based on Taylor's medical history and the facts surrounding her incarceration. Dr. Weinstein, based on his medical experience, provided a sufficient scientific basis for his position that, among other things, Taylor's vomiting could have exacerbated her heart condition and hastened her death. *Cf. Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1183 (7th Cir. 1985) (finding that expert's testimony that chance of survival would have been 10-30% if advanced cardiac life support had been timely administered was sufficient to uphold jury verdict).

The district court also took issue with the fact that, aside from lack of medication and the nurses' failure to treat Taylor's vomiting, Dr. Weinstein did not posit any possible alternative causes of Taylor's heart failure. Aside from failing to account for the inefficiencies of requiring an expert to list each and every possible cause of a given outcome, this analysis misinterprets Dr. Weinstein's testimony as being directly related to Taylor's "cause of death." Dr. Weinstein did not conclude that Taylor's vomiting was a one-hundred percent certain cause of her death. As we have held on many occasions, an expert need not testify with complete certainty about the cause of an injury; rather he may testify that one factor could have been a contributing factor to a given outcome. *See Walker v. Soo Line R. Co.*, 208 F.3d 581, 587-88 (7th Cir. 2000). The possibility that a cause other than Taylor's vomiting was ultimately responsible for her injury is properly left for exploration on cross-examination. *See id.; Cooper*, 211 F.3d at 1021 ("The possibility of Mr. Cooper's [chronic pain syndrome] being attributable to a factor other than the fall is a subject quite susceptible to exploration on cross-examination by opposing counsel. Similarly, the accuracy and truthfulness of the underlying medical history is subject to meaningful exploration on cross-examination and ultimately to jury evaluation. Therefore, Nelson's contention that other conditions of Mr. Cooper's might have caused his CPS goes to the weight of the medical testimony, not its admissibility."). Further, whether the cause put forth by a qualified expert actually proximately caused the injury at issue is a question for the jury at trial;

a district court should only evaluate whether an expert's conclusion on causation was reasoned and based on a reliable methodology. *Cooper*, 211 F.3d at 1015 ("Although the existence of a duty must be determined as a matter of law, the question of whether there was a breach of that duty and an injury proximately caused by that breach are questions of fact for the jury."). Last, the plaintiff need not show that the defendants' failure to treat her vomiting ultimately caused her death, but merely that it exacerbated her medical problems, because the constitutional violation in question here is the failure to provide adequate medical care to Taylor in response to a serious medical condition, and not "causing her death". *See Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) ("A delay in the provision of medical treatment for painful conditions—even non-life-threatening conditions—can support a deliberate-indifference claim so long as the medical condition is 'sufficiently serious or painful.'") (citations omitted); *see also Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007) ("[A] jury could find that the defendants' delay caused [the inmate] six extra hours of pain and dangerously elevated blood pressure for no good reason."). For these reasons, the district court abused its discretion in finding that Dr. Weinstein's testimony regarding the link between Taylor's vomiting and her death was unreliable.

In summary, given that none of the medical experts in this case can determine the exact cause of Taylor's untimely death, aside from non-specific heart failure, the jury should hear testimony, backed by accepted medical science, about factors that could have exacerbated her

heart condition. After hearing from all of the experts, and after vigorous cross-examination, it will be up to the jury to determine which of these factors, if any, proximately caused an injury to Taylor. Dr. Weinstein's testimony regarding the interaction between Taylor's vomiting and her heart condition as well as his testimony regarding the standard of medical care in prisons and the effects of delaying care are admissible, but his testimony regarding the role that PCJ's failure to provide Taylor with her CHF medications may have played in her death is not. As always, on remand the district court retains the discretion to exclude portions of Dr. Weinstein's testimony that are inconsistent with any of the other Federal Rules of Evidence.

**B.   Deliberate Indifference to a Serious Medical Condition**

In order to sustain a § 1983 claim for violation of Taylor's Fourteenth Amendment due process right to adequate medical care, the plaintiff must show that: (1) Taylor had an objectively serious medical condition; (2) the defendants knew of the condition and were deliberately indifferent to treating her; and (3) this indifference caused her some injury. *See Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008); *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999). An objectively serious medical condition is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes*, 546 F.3d at 522. A medical condition

need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *See Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999).

With regard to the deliberate indifference prong, the plaintiff must show that the official "acted with the requisite culpable state of mind." *Id*. This inquiry has two components. The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk. *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006). Evidence that the official acted negligently is insufficient to prove deliberate indifference. *See Payne for Hicks v. Churchich*, 161 F.3d 1030, 1040 (7th Cir. 1998). Rather, "'deliberate indifference' is simply a synonym for intentional or reckless conduct, and that 'reckless' describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred." *Qian*, 168 F.3d at 955. Simply put, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Higgins v. Corr. Med. Serv. of Ill., Inc.*, 178 F.3d 508, 510 (7th Cir. 1999); *see also Hudson v. McHugh*, 148 F.3d 859, 864 (7th Cir. 1998). Even if a defendant recognizes the substantial risk, he is free from liability if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 843 (1994). Whether a medical condition is "serious" and whether a defendant was "deliberately indifferent" to it are fact questions, to be resolved by a

jury if a plaintiff provides enough evidence to survive summary judgment. *See Hayes v. Snyder*, 546 F.3d 516, 523 (7th Cir. 2008). The district court granted summary judgment to the defendants because it found that they did not show a deliberate indifference to a serious medical need of Taylor's; we review this decision de novo, viewing all facts in the light most favorable to the plaintiff. *Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007).

**1.    Objectively Serious Medical Condition**

The district court found that Taylor's CHF, but not her vomiting, was a serious medical condition. There is no dispute that Taylor had a serious heart condition, CHF, which was diagnosed by a doctor. Taylor's prison medical records reflected this and noted that she was required to take six different medications to manage this condition. So, Taylor's CHF was a serious lifelong medical condition, and a jury could find that Taylor's complaints of chest pain during her incarceration at PCJ made the defendants aware that she had an "objectively serious medical condition" that required medical intervention.

Vomiting, in and of itself, is not an uncommon result of being mildly ill, and, absent other circumstances (e.g., vomiting continuously for a long period of time, having blood in one's vomit, or the like), does not amount to an objectively serious medical condition. However, given that PCJ and its medical staff were on notice of Taylor's CHF, they should have been more concerned about her vomiting than that of the average ill inmate. When Taylor

arrived at PCJ she complained of chest pain. Subsequently, she complained of nausea and vomited enough to make several prison guards very concerned for her health. There is no need to parse the two conditions and call one serious and the other not. As Dr. Weinstein testified, excessive vomiting could exacerbate Taylor's heart condition. The seriousness of her vomiting is highlighted by the fact that several prison guards thought it prudent to collect her vomit in a bag and call the nurse to see if Taylor could be examined immediately. At minimum, a jury could find that, although not life threatening, Taylor's vomiting could have led to increased pain or injury as a result of her heart condition, allowing the plaintiff to survive the defendant's motion for summary judgment on the issue of whether she exhibited a serious medical condition. *See Farmer*, 511 U.S. at 843.

### 2.    Deliberate Indifference

The district court did not find that any of the defendants' actions extended beyond mere negligence into the realm of deliberate indifference because it found that Taylor's complaints were not indicative of "crushing chest pain" or "chest pain that signaled an emergency." Given this conclusion, the district court found that the nursing staff was reasonable in assuming Taylor was drug seeking and responded appropriately to Taylor's complaints by putting her on the list to be seen by a doctor three days after her initial complaints of chest pain. In reaching these conclusions, the analysis weighed the evidence

and neglected to view the facts in the light most favorable to the plaintiff as the non-moving party. The record reflects that Taylor's CHF was a life threatening condition known to the defendants through Taylor's medical records. Her specific complaints of chest pain while she was incarcerated at PCJ, either alone or in conjunction with her serious vomiting, could certainly lead a jury to believe that she had a serious medical condition. Whether a reasonable jury could possibly find for the plaintiff depends on the knowledge each individual defendant had regarding Taylor's condition, and how each defendant responded to her requests for medical attention. So, we must examine the defendants' knowledge and actions individually.

### a.    Dr. Johnson, Sheriff McCoy, and Superintendent Smith in Their Individual Capacities

Dr. Norman Johnson, Sheriff Michael McCoy, and Superintendent Steven Smith did not have contact with Taylor during the days immediately preceding her death. So, in order to sustain a due process claim against them, the plaintiff needs to show that they had knowledge of Taylor's condition and somehow ratified the deliberate indifference of those persons who were directly responsible for Taylor's care. *See Hudson*, 148 F.3d at 863. Given that the record reveals no evidence that they knew of Taylor's incarceration, condition, or requests for medical attention, summary judgment in their favor is appropriate.

### b. Advanced Correctional Healthcare, Inc., Peoria County, Illinois, and Defendants in Their Official Capacities

It is well established that there is no respondeat superior liability under § 1983. *See Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 619-20 (7th Cir. 2001). A "private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982). Generally, to maintain a viable § 1983 action against a municipality, a government agent (such as Advanced Correctional Healthcare, Inc.), or individual policymaking defendants in their official capacities (such as Johnson, McCoy, and Smith), a plaintiff must demonstrate that a constitutional deprivation occurred as the result of an express policy or custom promulgated by that entity or an individual with policymaking authority. *See Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001).

So, in order to maintain an action against Advanced Correctional Health Care, Inc. or Peoria County, the plaintiff must show that PCJ's healthcare policy was a "moving force" behind Taylor's death or needless suffering. *Latuskin*, 250 F.3d at 505. Here, the plaintiff cites two policies which he contends contributed to Taylor's death. First, he claims that the jail's policy did not permit the guards to directly contact Dr. Johnson when they felt that a prisoner needed a doctor's attention. Second, he argues that when a prisoner is "very sick" guards should check on her every half hour.

At PCJ, a doctor is present to take appointments on Mondays, Wednesdays, and Fridays. The doctor is on call twenty-four hours a day, seven days a week, for any medical emergency. Prison policy dictates that a doctor is supposed to be contacted if a prisoner complains of a serious medical condition, specifically including chest pain. At all other times there is a nurse or nurse practitioner on site to handle minor emergencies and other ailments. Although mandating a doctor's visit or constant prisoner checks would likely reduce the number of illness-related deaths or injuries, it is neither economically prudent nor feasible to put such policies in place. As the plaintiff conceded at oral argument, the policies that were in place were sufficient to provide Taylor with adequate medical care; instead, the plaintiff alleges that the harm to Taylor resulted from the nurses' failure to follow these policies. So, any type of *Monell* claim fails. *See Monell v. City of New York*, 436 U.S. 658 (1978). As such, summary judgment for all non-nurse defendants is appropriate.

We now turn to the defendants that actually had contact with Taylor prior to her untimely death.


### c.    Nurse Radcliff

Nurse Radcliff was the first medical professional to "treat" Taylor upon her arrival at PCJ. Taylor complained of chest pains. Nurse Radcliff failed to follow PCJ's protocol which requires her to contact a doctor when an inmate complains of chest pains. She also failed to take Taylor's vital signs.

Instead, Nurse Radcliff responded to Taylor's complaints by putting her on the list to have her vitals checked each morning, and, according to her own statements, asked Taylor about the severity of her chest pain. More importantly, she had Taylor call her brother to bring her CHF medication to PCJ and put a specific note on Taylor's chart to call the doctor if the medication was not delivered by the next day. "[D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996). If this standard is not met, the deliberate indifference question may not go to the jury. *Id.* Here, although she did not have Taylor immediately examined by a doctor, given that she took reasonable measures to ensure that Taylor would get her medication, and put a notation in her chart to have her seen by a doctor if they did not arrive, it cannot be said that Nurse Radcliff's judgment departed so substantially from the professional norm that she acted deliberately indifferent to Taylor's health. Nor can it be said that her actions were "so dangerous" that the deliberate nature of her conduct can be inferred. *Qian*, 168 F.3d at 955. So, summary judgment in Nurse Radcliff's favor is appropriate.

### d.     Nurse Mattus

Nurse Mattus examined Taylor after she complained of nausea. During this examination, Taylor neither vomited nor complained of chest pain. In response, Nurse Mattus put Taylor on the morning sick call list, but refused to give her any medication to quell her nausea. Certainly Nurse Mattus should have checked Taylor's chart and ascertained whether Taylor's CHF medications had been delivered, and in response to finding that they had not been, immediately followed up with Dr. Johnson. But, her failure to do so was not a deliberate indifference to a serious medical condition, but mere negligence— Taylor neither vomited nor complained of chest pain during the visit; had she done so, our analysis might be different. But since she did not, and negligence is not actionable as a due process violation, summary judgment in favor of Nurse Mattus is appropriate. *See Steele v. Choi*, 82 F.3d 175, 178 (7th Cir. 1996) (courts must "distinguish between deliberate indifference to serious medical needs of prisoners, on the one hand, and negligen[ce] in diagnosing or treating medical condition, on the other," and "only the former" violates the Eighth Amendment (citations omitted)).

### e.     Nurse Hibbert

Later that morning, Taylor again went to PCJ's infirmary complaining of nausea. Nurse Hibbert examined her and found that her blood pressure was high. Taylor asked for anti-nausea medication but did not vomit. Nurse Hibbert did not give Taylor this medication, but she

testified that had she seen Taylor vomit, protocol would have dictated that she administer anti-nausea medication to her. She also testified that she knew of Taylor's CHF, and that the prison policy stated that a nurse should retrieve a prisoner's medical chart before examining her. Had she done so, she would have seen that Taylor was supposed to have been examined by a doctor because her brother failed to bring her CHF medications to the prison, and that Taylor had complained of chest pain during intake.

Later that day, Taylor vomited while attending a court proceeding via video. The prison guards were so concerned about Taylor's health that they felt it necessary to collect her vomit in a trash bag. Admirably, they immediately called Nurse Hibbert and told her that Taylor needed to be examined as soon as possible. (Nurse Hibbert disputes the guards' version of events, but for our purposes we accept it as true). Despite clear indications that Taylor was in serious medical need—she had complained of chest pain, exhibited high blood pressure hours earlier, and vomited during a video hearing—Nurse Hibbert refused to see Taylor, and instead told the guards to have her fill out a sick request form. *See Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) (quoting *Farmer*, 511 U.S. at 842) ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."). Nurse Hibbert herself admitted that if she had seen Taylor vomit, she would have given her anti-nausea medication. But faced with the guards' concern and a bag full of vomit, she did not. In fact, the record reveals that the reason she did

nothing was, because, according to the guards' testimony, it was approaching the end of her shift and she wanted to let the next nurse handle the situation. As a result of her inaction, Officer Browning, one of the guards that told Nurse Hibbert to examine Taylor, thought that Nurse Hibbert violated prison protocol, and filed a complaint against her. And all three of the guards present at the video hearing testified for the plaintiff in this matter.

Given that Nurse Hibbert refused to treat or even see Taylor in spite of her serious medical condition, a jury could easily find that her actions surpassed mere negligence and entered the realm of deliberate indifference. In fact, the guards' testimony regarding Taylor's condition, and the various acts that they took to try to help her, shows that even a layperson would believe that Taylor's condition was serious. *See Hayes*, 546 F.3d at 522. Therefore, we reverse the district court's grant of summary judgment in favor of Nurse Hibbert.

### 3.    Proximate Causation

The district court also found that none of the nurses' actions was the proximate cause of Taylor's death. *See Berman v. Young*, 291 F.3d 976, 982 (7th Cir. 2002) (noting that plaintiff must "produce evidence that she sustained actual injury and that her injuries had a causal connection with the alleged [Section 1983] due process violation") (citations omitted). The district court concluded Gayton needed to show, through expert testimony, that the nurses' inaction necessarily caused Taylor's death. And without such testimony, the district court found he could not establish proximate cause.

Because Dr. Weinstein's testimony concerning the possible connection between Taylor's vomiting and her tachycardia should not have been excluded, the plaintiff now has expert evidence to establish causation. Moreover, even if the plaintiff could not proffer expert testimony in this case, he still would have adequate causation evidence to reach trial against Nurse Hibbert. Proximate cause is a question to be decided by a jury, and only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation. *See Grieveson*, 538 F.3d at 779; *Cooper*, 211 F.3d at 1015. Expert testimony is not always necessary to establish causation in a case where an inmate alleged that prison employees violated his due process rights by failing to provide him with adequate medical care:

> Clearly, expert testimony that the plaintiff suffered because of a delay in treatment would satisfy the requirement. On the other hand, evidence of a plaintiff's diagnosis and treatment, standing alone, is insufficient if it does not assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him.

*Grieveson*, 538 F.3d at 779 (citing *Liefer*, 491 F.3d at 715).

But if the plaintiff offers evidence that allows the jury to infer that a delay in treatment harmed an inmate, there is enough causation evidence to reach trial. *Grieveson*, 538 F.3d at 779. In *Grieveson*, an inmate alleging prison officials violated his due process rights by failing to provide him with adequate medical care

did not introduce expert testimony that the delay in medical care caused him to suffer. *Id.* Nonetheless, because he introduced the medical records relating to his injury, which could have led a jury to infer that a delay in treatment could have unnecessarily prolonged and exacerbated his injury, we concluded he had enough evidence to survive summary judgment. *Id*. The same is true here. The plaintiff has offered evidence that Taylor had a serious medical condition, the guards thought her condition serious enough that she needed medical attention, and Nurse Hibbert actively ignored her requests for treatment. This is enough for a jury to find that Taylor incurred "many more hours of needless suffering for no reason" as a result of Nurse Hibbert's inaction. *Id*. This is especially true because the constitutional deprivation at issue is a failure to provide Taylor with due process in the form of adequate medical treatment; the plaintiff need not prove that Nurse Hibbert's inaction necessarily led to Taylor's death, but rather that her suffering was exacerbated by Nurse Hibbert's failure to provide her with adequate medical care. *See id.; see also Liefer*, 491 F.3d at 715-16.

## III. CONCLUSION

Therefore, we AFFIRM IN PART and REVERSE IN PART the district court's exclusion of Dr. Weinstein's testimony. The district court properly excluded Dr. Weinstein's testimony as it relates to the effects of PCJ's failure to provide Taylor with her CHF medications. However, his testimony regarding the adequate standard of med-

ical care in prisons and the effect that Taylor's vomiting may have had on her heart condition should not have been excluded. We AFFIRM the district court's grant of summary judgment to Dr. Johnson, McCoy, Smith, Advanced Correctional Healthcare, Inc., Peoria County, Nurse Mattus, and Nurse Radcliff because no reasonable jury could conclude that their actions amounted to deliberate indifference to a serious medical need. Because a jury could find that Nurse Hibbert's inaction amounted to deliberate indifference to a serious medical need of Taylor's, we REVERSE the district court's grant of summary judgment in her favor, and remand for trial on the plaintiff's § 1983 claim against her. Because the plaintiff has failed to develop any argument relating to the district court's award of summary judgment to the defendants on his state law claims, he has waived any objection to the court's decision on those claims, and therefore we AFFIRM on those claims. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 738 (7th Cir. 2008).