WOOD, Chief Judge,
concurring in part and dissenting in part.
Calvin Whiting is suffering from a deadly disease: a rare form of non-Hodgkin’s lymphoma. The Mayo Clinic’s website describes this as “a cancer that originates in *665 your lymphatic system,” and then spreads throughout the body. See Non-Hodgkin’s lymphoma, Definition, Mayo Clinio, http:// www.mayoclinic.org/diseases-conditions/ non-hodgkins-lymphoma/basics/definition/ con-20027792 (last visited Oct. 12, 2016). Whiting fell ill while he was serving a sentence in Illinois’s Shawnee Correctional Center for a probation violation, and so of necessity he turned for help to the prison doctors. Dr. Alfonso David, the medical director at Shawnee and an employee of Wexford Health Sources, Inc., the company that holds the contract for medical services at that institution, was Whiting’s treating physician.
It took Dr. David almost two months from Whiting’s first visit to the infirmary in mid-October 2010 to get approval for a biopsy of nodules in Whiting’s swollen lymph nodes, even though he had power to order one if he deemed it an “emergency,” Despite the fact that Whiting presented not only with pain in his left jaw and his ear, but also with nodules and pain in his groin, a nurse at Shawnee thought he had an ear or throat infection and gave him amoxicillin (plus Motrin for his pain). .The amoxicillin caused a rash, and so a few days later Dr. David switched him to Bac-trim and ordered chest and abdominal x-rays. Those results showed enlarged cervical (neck) nodes and a mass in Whiting’s left jawbone. Whiting was also complaining of severe pain. It was then that Dr. David suggested a biopsy of the nodules to a second colleague, who vetoed that course. (Defendants describe this as submission to a “review committee,” but that is a bit grandiose for a simple process through which one doctor consults with a second and allows the second to override his recommendation.)
During November and December, Dr. David continued with the fruitless course of antibiotics, although he changed the particular drugs to doxycycline -and Aug-mentin. In early December, he again suggested a biopsy to the other colleague. This time the two agreed to order the biopsy. It was performed on December 21 and revealed that Whiting had Stage IV SLK positive anaplastic large cell lymphoma. (A group called the Lymphoma Research Foundation describes this as a rare type of aggressive T-cell lymphoma, which can progress rapidly without treatment. See Lymphoma Research Foundation, http://www.lymphoma.org/site/pp.asp?c= bkLTKaOQLmK8E& b=6293639 (lást visited Oct. 12, 2016).) Whiting began chemotherapy at that point and has continued his battle with cancer, cycling between remission and relapse.
Focusing only on the two months between his first visit to Dr. David and the start of his chemotherapy, Whiting sued both Dr. David and Wexford, contending that the care he received violated his Eighth Amendment right to be free from cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). During that period, he contends, he was in severe pain and his cancer was going untreated. Dr. David knew that Whiting was suffering and that a biopsy was necessary, yet he proceeded on a “business as usual” basis. Dr. Nancy Bartlett, who treated Whiting later at Barnes Jewish Hospital in St. Louis, described this delay in treatment as “cruel and unusual,” Whiting’s treating oncologist after his release from Shawnee, Dr. Justin Kline, said much the same thing. Dr. Kline opined that if chemotherapy had been started right away, it would have had two desirable effects: alleviation of Whiting’s pain and destroying the cancer. He also declared that Whiting “would not have experienced the pain he did between October 27, 2010, and January 2011” if the biopsy had been performed, when Dr. David, first mentioned that possibility.
*666 The district court granted summary-judgment for both defendants, and my colleagues have voted to affirm. I agree with them that Whiting’s case against Wexford was properly rejected, but, without taking any position on the ultimate outcome, I would reverse and remand for further proceedings against Dr. David.
It is well established that a prisoner asserting an Eighth Amendment claim based on the medical care he received must show two things: first, that he has a serious medical need, and second that the defendant was deliberately indifferent— not merely negligent or oblivious—to his needs. Gamble, 429 U.S. at 104, 97 S.Ct. 285; see also Farmer v. Brennan, 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). I focus here only on the subjective element of the test, because all members of this panel agree with the district court that there was enough evidence to reach a jury on the objective element. This is the same type of case as the one we considered in Petties v. Carter, No. 14-2674, 836 F.3d 722, 2016 WL 4631679 (7th Cir. Aug. 25, 2016) (en banc), in which the inmate received some medical care, but the facts permit more than an inference of medical malpractice—they permit an inference of deliberate indifference.
The critical point that Petties established is that the furnishing of some care does not automatically defeat an Eighth Amendment claim (raised through the Fourteenth Amendment for a state prisoner). Instead, as Petties held, it is essential to “look at the totality of an inmate’s medical care when considering whether that care evidences deliberate indifference to serious medical needs.” Id. at 728, 2016 WL 4631679 at *3. We went on to say that “[i]f a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it.” Id. Acknowledging that the line between (minimally) competent medical judgment and deliberate indifference can be difficult to draw, we gave several examples of situations in which a finding of an Eighth Amendment violation is possible. At least two of them fit Whiting’s allegations: “[persistence] in a course of treatment known to be ineffective,” id. at 730, 2016 WL 4631679 at *4, and the choice of “an easier and less efficacious treatment without exercising professional judgment,” id. at 730, 2016 WL 4631679 at *5 (internal quotation marks omitted). We summarized the central point as follows:
[Rjepeatedly, we have rejected the notion that the provision of some care means the doctor provided medical treatment which meets the basic requirements of the Eighth Amendment. Rather, the context surrounding a doctor’s treatment decision can sometimes override his claimed ignorance of the risks stemming from that decision. When a doctor says he did not realize his treatment decisions (or lack thereof) could cause serious harm to a plaintiff, a jury is entitled to weigh that explanation against certain clues that the doctor did know.

Id.

In my view, the rule most recently reaffirmed in Petties (dating back to Gamble) governs Whiting’s case. It would be possible on this record for a jury to conclude that Dr. David was exercising his medical judgment over the critical period, even if that judgment was mistaken or even negligent. He saw Whiting on several occasions; he tried various antibiotics, which he says he regarded as conservative responses to Whiting’s symptoms, and the antibiotic treatments at times seemed to be having some positive effect. He did not perceive Whiting’s situation to be an emergency, and so he did not exercise his limited *667 authority to order a biopsy on his own. Instead, he invoked the “Collegial Review Committee” process described above.
But that is not the, only inference that is possible from these facts. Whiting has brought forth evidence that would permit a trier of fact to infer deliberate indifference. No one, Dr. David included, paid any attention to the fact that nodules were not limited to Whiting’s neck and face, but instead were also in his groin. A jury could conclude that Dr. David paid no heed to the fact that the antibiotics and Motrin he was prescribing for Whiting’s pain were, by Whiting’s account, utterly ineffective. Had he cheeked the medical records, he would have seen that Whiting repeatedly informed Shawnee’s medical unit that he was in extreme pain. In McGowan v. Hulick, 612 F.3d 636 (7th Cir. 2010)—decided before Whiting’s first complaint about nodules in his left jaw and groin, and accompanying pain—we reaffirmed that “[a] delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate’s pain.” Id. at 640 (citing Gamble, 429 U.S. at 104-05, 97 S.Ct. 285); Gayton v. McCoy, 593 F.3d 610, 619 (7th Cir. 2010); and Edwards v. Snyder, 478 F.3d 827, 832 (7th Cir. 2007). See also Petties, 836 F.3d at 730-31, 2016 WL 4631679 at *5; Arnett v. Webster, 658 F.3d 742, 753 (7th Cir. 2011). A delay when the physician recognizes that the condition may be life-threatening (as Dr, David did, given his initial request for a biopsy) is even more troublesome. Perhaps if Dr. David had tried one or two courses of antibiotics before moving to more serious measures, this case would be different. But a jury could find that it was apparent by the time the third and fourth antibiotics were tried that this course of treatment was ineffective for both the underlying condition and the pain.
Finally, the existence of the so-called collegial review mechanism does not compel summary judgment in favor of Dr. David. It -is, in effect, a device to obtain a second opinion. As the record presently stands, it is unclear whether the second doctor’s “no” automatically trumps the treating physician’s judgment that a procedure is necessary (a situation that would undermine a finding of deliberate indifference on the first doctor’s part), or if the second doctor just has an opportunity to persuade the first doctor to reconsider his opinion. The former does not strike me as “collegial,” and the latter is not something that deserves to be called a “review.” Nothing reveals whether, or why, Dr. David changed his mind about the need for a biopsy at the end of October. Taking the facts and reasonable inferences from them in the light most favorable to Whiting, I must assume that Dr. David saw no reason to invoke his authority to override the second doctor and obtain a biopsy on an urgent basis. A jury would be entitled to infer deliberate indifference to Whiting’s serious medical need on the basis of those facts.
Looking at the record as a whole in the light most favorable to Whiting, I conclude that summary judgment in Dr. David’s favor should not have been granted. I therefore dissent to that extent and would order further proceedings on this part of the case.