In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 18-2324

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CATHY NICOLE TRUITT,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 CR 718 — **John Z. Lee**, *Judge*.

_____

ARGUED FEBRUARY 21, 2019 — DECIDED SEPTEMBER 12, 2019

_____

Before EASTERBROOK, SYKES, and BARRETT, *Circuit Judges*.

SYKES, *Circuit Judge*. In late 2009 Cathy Truitt filed seven nearly identical tax returns, each falsely claiming that she was entitled to a $300,000 refund. The IRS identified six of the seven as fraudulent, but for unknown reasons it approved one and sent her a check for the full amount. Within weeks the IRS recognized the error and demanded that she return the funds. She did not respond. Instead, she spent the money on jewelry, a condominium, tickets to sporting

events, and a business investment. The IRS launched an investigation, and eventually she was indicted for making false claims against the United States in violation of 18 U.S.C. § 287 and theft of government funds in violation of 18 U.S.C. § 641. A jury found her guilty as charged.

Truitt's appeal is limited to a single issue. She challenges the exclusion of her expert witness, psychologist Dr. Michael Fogel, who proposed to testify that Truitt was a member of a "charismatic group"—a cult-like organization that indoctrinates its members. Truitt intended to offer this testimony to bolster an argument that she lacked the requisite *mens rea* for the crimes. The district judge excluded the testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Rules 702 and 704(b) of the Federal Rules of Evidence.

That ruling was sound. The judge reasonably concluded that Dr. Fogel lacked the relevant expertise and his methods were not reliable. We affirm the judgment.

## I. Background

In March 2009 Truitt joined the Moorish Science Temple of America, which views itself as a sovereign "ecclesiastical government." The Moorish Temple teaches that neither the states nor the federal government have any authority over its members, who instead purport to hold something akin to diplomatic immunity. Before initiation into the Temple, members fill out a series of forms designed to put the government on notice of their new nationality. After a ceremony, the Temple provides members with Moorish identification cards, license plates, and other documents backing up their purported change in citizenship.

Truitt quickly became an active member of a Moorish temple on Chicago's west side. The group was small—at most about 25 members—and Truitt spent as many as 40 hours a week on church-related activities. She also developed a close relationship with the local leader, Queen Akefe Muzari El ("Queen"). Three months after Truitt joined, Queen told her congregants that the Temple's founding prophet had established a trust funded by the United States government and designed to benefit Moorish nationals. To prepare her members to collect funds from the trust, Queen led them through a variety of rituals and ceremonies. She then instructed them to use symbolic numbers to claim a refund on a series of IRS Form 1041s—the tax return used by trusts and estates. Some of the numbers were provided by a church elder; others came from numerology. Queen told Truitt and other Moors that if the government sent them money in response to the tax returns, they were to tithe 25% back to the Temple. Queen also warned her followers to expect "pushback" from the government—attempts to block the Moors from collecting despite their legitimate entitlement. This resistance, Queen said, signified nothing about the legitimacy of their right to payment. She instructed them to refile the 1041 forms if they received a frivolous-filing notice.

In August 2009 Truitt filed three identical 1041 forms for the years 2006, 2007, and 2008. Each one claimed entitlement to a refund because an excess of $304,204.30 in taxes had been withheld from the income of a trust in her name. In truth, there was no trust and no taxes were withheld at all.

As Queen predicted, the IRS pushed back. It sent Truitt letters informing her that each of the three 1041 forms was

frivolous. In the back-and-forth that followed, Truitt filed four more identical 1041 forms, while the IRS responded with more notifications that the forms were meaningless. But in the midst of this flurry of filings and responses, on January 5, 2010, the IRS issued a refund check for the full $304,204.30 refund Truitt claimed for one of the tax years. On January 19 she opened a Post Office Box in the name of "Maji Atarah El," and the next day she deposited the Treasury check into a new account at Wachovia Bank in the name of the "Maji Atarah El Trust." She listed the Post Office Box as the account holder's address.

The IRS noticed the error almost immediately, and within five weeks Truitt received notice that she was required to return the money. She instead rapidly depleted the funds. By this time she was less involved with the Temple, and Queen excommunicated her for lack of attendance. So rather than tithe 25% of the sum back to the Temple, Truitt gave roughly $75,000 of her refund to several Moors she was still in touch with. She then placed $200,000 in several accounts in her father's name. Those funds quickly disappeared. They paid for, among other things, jewelry, a down payment on a Michigan Avenue condominium, Chicago White Sox and Bulls tickets, and an investment in a diamond business. Notably, almost all of this activity occurred after the IRS notified her of the mistake. By April 2010 the Wachovia account held only about $200.

Throughout this period the IRS continued to send Truitt notices that it had mistakenly sent the refund check. When two agents later visited her Michigan Avenue home, she refused to acknowledge herself by name. When they showed

her a copy of the refund check, she denied ever having seen it.

In 2014 a grand jury indicted Truitt on four counts of submitting false claims in violation of 18 U.S.C. § 287 and one count of theft from the United States in violation of 18 U.S.C. § 641. Truitt's primary defense was that she lacked the requisite *mens rea* because she truly believed that the Moorish trust existed and that the 1041 forms were a legitimate way to access it.

To support this defense, she intended to offer the testimony of Dr. Michael Fogel, a forensic psychologist. Dr. Fogel has extensive experience evaluating criminal defendants, generally focusing on issues like insanity, competence to stand trial, and risk of violence. In his report summarizing his expertise and proposed testimony, Dr. Fogel claimed to be an expert on "charismatic groups," which he defined as a "type of cultic group" that influences its members through "a shared belief system, a high level of social cohesiveness, a strong influence to comply with the group's behavioral norms, and assigning charismatic and sometimes divine power to the group or its leadership." He distinguished this from other types of cultic groups that use physical coercion.

The government moved in limine to exclude Dr. Fogel's testimony. The judge granted the motion. His first concern was that Dr. Fogel might try to testify directly that Truitt truly believed the 1041 forms she filed were legitimate. Rule 704(b) forbids that kind of expert testimony: "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime

charged or of a defense." So the judge narrowly construed Dr. Fogel's proposed opinion to say only that Truitt is the type of person who is *susceptible* to indoctrination. Even as narrowed, however, the judge ruled that Dr. Fogel failed to identify the scientific basis he used to reach his conclusions.

The judge gave the defense an opportunity to address these concerns in an amended submission. In an addendum to his report, Dr. Fogel proposed to give two opinions: (1) that the Moorish Temple is a charismatic group under his definition and (2) that charismatic groups can cause a person to ignore his moral compass and do things he otherwise wouldn't.

The judge rejected the reformulated opinions for three reasons. First, he found that Dr. Fogel lacked the expertise needed to speak authoritatively about charismatic groups. Among other things, Dr. Fogel had worked on only a single case involving religious themes of any kind. His expertise is instead in psychological diagnosis, but Rule 704(b) would block any direct testimony about Truitt's mental condition. Second, the judge held that Dr. Fogel's methods were unreliable. Most concerning, Dr. Fogel deviated dramatically from the methods of other experts in the field—indeed, of the very expert whose work he used to educate himself on charismatic groups. Third, and as an independent ground of decision, the judge excluded Dr. Fogel's testimony under Rule 403 of the Federal Rules of Evidence because its probative value was slight compared to the substantial risk of jury confusion.

The case proceeded to trial, and the jury convicted Truitt on all counts. This appeal followed.

## II. Discussion

Truitt's sole argument on appeal is a challenge to the exclusion of Dr. Fogel's testimony. A split standard of review applies. We review de novo whether the judge applied the proper legal framework for determining the admissibility of expert testimony. *United States v. Brown*, 871 F.3d 532, 536 (7th Cir. 2017). If the judge applied the proper legal framework, then we review the decision to exclude evidence for abuse of discretion. *Id.* "District judges have wide discretion over decisions to admit or exclude evidence; we will reverse only if no reasonable person would take the judge's view of the matter." *Id.*

Rule 702 entrusts trial judges with a gatekeeping role designed "to ensure that expert testimony is both relevant and reliable." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). To that end, the judge must determine whether the expert is qualified, whether his methodology is scientifically reliable, and whether the proposed testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702; *see also Daubert*, 509 U.S. at 592 (explaining that the latitude given to experts under the Rules of Evidence "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline").

The judge properly applied this legal framework, so our review of his decision to exclude Dr. Fogel's testimony is deferential. Turning first to the question of qualifications, Dr. Fogel is a forensic psychologist with some specialization in certain group dynamics—for instance, he has expertise in the effect of peer pressure on juveniles serving probation—but he has no relevant experience with charismatic groups.

Because we ask not whether an expert "is qualified in general" but whether he is qualified "to answer a specific question," *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010), that limitation is all but dispositive: Dr. Fogel lacks experience with charismatic groups, so he shouldn't give expert testimony on that subject.

To be sure, nothing in Rule 702 or *Daubert* categorically bars a generalist like Dr. Fogel from opining on more specialized topics. *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016) ("Ordinarily, courts impose no requirement that an expert be a specialist in a given field." (quoting *Gayton*, 593 F.3d at 617)). To give an example, a general physician may, depending on his experience, be qualified to testify about heart conditions regardless of whether he is a licensed cardiologist. But that doesn't mean a generalist is *necessarily* qualified to speak on specialized subjects: "[W]e must look at each of the conclusions he draws individually to see if he has the adequate education, skill, and training to reach them." *Gayton*, 593 F.3d at 617.

So Truitt is correct when she says that Dr. Fogel should not be excluded merely because he is a generalist. But that's not why the judge excluded his testimony. He did so because Dr. Fogel's experience as a general psychologist in no way qualified him to answer specific questions about the religious themes at play in this case. Nor did his experience with *other* kinds of group dynamics prepare him for the question at hand. Everyone agrees that Dr. Fogel had no experience with charismatic groups, so the judge quite reasonably concluded that he was not qualified to give this proposed testimony.

The judge also ruled that Dr. Fogel's methodology was inadequate and thus not scientifically reliable. This ruling too lies well within the judge's discretion. The "overarching subject" of Rule 702 analysis "is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed [expert] submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594–95. *Daubert* identifies a number of factors a court might consider, including whether the methods have been tested or subjected to peer review and whether they are generally accepted in the field. *See id.* at 593–94. But the list is not exhaustive. *See id.* at 593 ("Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test.").

Here the judge was concerned that Dr. Fogel did little to learn about the Moorish Temple other than interviewing Truitt herself. That's a fairly significant shortcoming in a case about group dynamics: Dr. Fogel's definition of a "charismatic group" requires evaluating whether there was a "shared belief system," a "high level of social cohesiveness," and "a strong influence to comply with the group's behavioral norms." The judge reasonably concluded that an evaluation of those three factors required at least a minimal inquiry into the experiences of other group members. Yet Dr. Fogel spoke to Truitt alone. Granted, he attempted to contact Queen and one other elder. But he made no effort to contact anyone else associated with the Moorish Temple. Compounding the problem, Truitt had a strong self-interest in convincing Dr. Fogel that the church could and did trick her into filing false claims.

Curiously, Dr. Fogel omitted these steps in the analysis even though Dr. Marc Galanter—the expert in charismatic groups whose work Dr. Fogel relied on most to learn about the subject—would have done far more. When Dr. Galanter identifies charismatic groups in his own work, he first circulates written surveys, then conducts extensive interviews with a large number of members, and finally spends significant time observing the group in action. The judge was justifiably concerned that Dr. Fogel relied so heavily on Dr. Galanter's work but inexplicably applied a watered-down version of his methodology.

Truitt responds that experts often rely on interviews with defendants, sometimes exclusively so. That may be appropriate when a doctor makes a medical diagnosis. *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000). But Dr. Fogel's amended report disavowed any intention to make a medical diagnosis in light of the Rule 704(b) bar to that kind of expert testimony. And *Daubert* calls for case-specific analysis. The judge reasonably concluded that an expert who purports to give an opinion about group dynamics should have interviewed more than a single self-interested group member, especially when other experts in the field would have done so.[1]

---

[1] The judge also held that Dr. Fogel's reliance on Dr. Todd DuBose, another expert, conflicted with our decisions in *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002), and *In re James Wilson Associates*, 965 F.2d 160 (7th Cir. 1992). Those cases hold that while one expert may rely on another expert's work, he cannot serve as a mere mouthpiece in order to circumvent the Rules of Evidence. *See Dura Auto. Sys. of Ind., Inc.*, 285 F.3d at 611–14; *In re James Wilson Assocs.*, 965 F.2d at 172–73. We don't need to address the application of *Dura* and *Wilson Associates* here: regardless of whether Dr. Fogel leaned too heavily on

In short, the judge was well within his discretion to ex-
clude Dr. Fogel's testimony—both because the witness had
limited experience with the specific topic at hand and be-
cause he used questionable methods. The judge's Rule 702
analysis was on solid ground, so we have no need to address
his alternative Rule 403 ruling that the risk of jury confusion
substantially outweighed the probative value of Dr. Fogel's
testimony.

                                                                    AFFIRMED

---

Dr. DuBose, the methods he used were unreliable, so exclusion was
appropriate.