# United States Court of Appeals
## For the First Circuit

No. 10-1432

RAYMOND D. LEAVITT,

Plaintiff, Appellant,

v.

CORRECTIONAL MEDICAL SERVICES, INC.; TODD TRITCH, individually
and in his official capacity as Medical Doctor; EDIE WOODWARD,
individually and in her official capacity as Physician Assistant;
TERESA KESTELOOT, individually and in her official capacity as
Health Services Administrator of Maine State Prison; CHARLENE
WATKINS, individually and in her official capacity as Family
Practitioner Nurse; ALFRED CICHON,

Defendants, Appellees,

YORK COUNTY JAIL; MAINE STATE PRISON; MARTIN A. MAGNUSSON,
individually and in his official capacity as Commissioner of the
Maine Department of Corrections; JEFFREY MERRILL, individually
and in his official capacity as Warden of Maine State Prison;
ROBERT COSTIGAN, individually and in his official capacity as
Prison Administrative Coordinator of Maine State Prison; JONNA
DINKEL, individually and in her official capacity as RN at Maine
State Prison; MATTHEW TURNER, individually and in his official
capacity as Physician Assistant,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. John A. Woodcock, Jr.,  U.S. District Judge]

Before

Boudin, Lipez, and Howard,
Circuit Judges.

James A. Billings, with whom Lipman, Katz & McKee was on brief, for appellant.

Elizabeth K. Peck, with whom Paul C. Catsos and Thompson & Bowie, LLP, were on brief, for appellee Alfred Cichon.

Christopher C. Taintor, with whom Jennifer A.W. Rush and Norman, Hanson & DeTroy, LLC, were on brief, for appellees Correctional Medical Services, Inc., Todd Tritch, Edie Woodward, Teresa Kesteloot, and Charlene Watkins.

———————————

June 29, 2011

———————————

**LIPEZ**, **Circuit Judge**. Plaintiff-appellant Raymond D. Leavitt, an inmate of the Maine corrections system, seeks a civil rights remedy for the alleged denial of adequate medical care for human immunodeficiency virus (HIV) by healthcare professionals at the York County Jail (YCJ) and the Maine State Prison (MSP). Claiming that correctional medical officials acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment, Leavitt brought suit under 42 U.S.C. § 1983 against a number of defendants, including Alfred Cichon, a physician assistant at YCJ; Correctional Medical Services, Inc. (CMS), the private contractor that provided medical care at MSP; and CMS employees Todd Tritch, Edie Woodward, Charlene Watkins, and Teresa Kesteloot.[1]  In separate orders, the district court granted summary judgment for Cichon and the CMS defendants, and Leavitt appeals.

We agree with the district court that Leavitt's evidence could not, as a matter of law, establish that the CMS defendants' actions violated the Eighth Amendment.  However, we conclude that Leavitt has established a material dispute as to whether Alfred Cichon acted with deliberate indifference to his serious medical needs.  We thus affirm the entry of summary judgment in favor of

---

[1] We refer to defendants CMS and its employees collectively as "the CMS defendants."

the CMS defendants, reverse the entry of summary judgment in favor of Cichon, and remand for further proceedings.

I.

Appellant is, and was at all times material to this case, HIV-positive. He was incarcerated at YCJ from September 6, 2006, through February 17, 2007, at which point he was transferred to MSP. He claims that the defendants inappropriately denied him treatment for HIV for the entirety of his 167-day stay at YCJ and for nearly seventeen months of his incarceration at MSP. This delay in the reinitiation of antiretroviral therapy for HIV, Leavitt alleges, "constituted a continuum of harm," which resulted in short- and long-term negative consequences for his health. We chronicle his treatment history in some detail as presented in the summary judgment record, presenting the facts in the light most favorable to Leavitt and drawing all reasonable inferences in his favor. Burrell v. Hampshire Cnty., 307 F.3d 1, 3 (1st Cir. 2002).

**A. Leavitt's Treatment at YCJ**

1. Initial Clinic Visit

At the time of his incarceration at YCJ, Leavitt suffered from HIV, hepatitis C, bipolar disorder, anxiety, and hypothyroidism. On October 5, 2006, about one month into his detention at YCJ, Leavitt had his first -- and only -- clinical

-4-

interaction with defendant Alfred Cichon.[2]  Cichon was the physician assistant who worked at the jail most frequently, about sixteen hours per week, and he also was president of Allied Resources for Correctional Health, Inc. (ARCH), the corporation that provided contract healthcare services to inmates at YCJ.

At the October 5 clinic visit, Cichon performed a routine physical examination of Leavitt, concluding that the latter's health in general was "normal."  Appellant told Cichon that he was HIV-positive; said that he was experiencing night sweats, chills, fever, nausea, and vomiting; and complained that he had not received his antiretroviral medications.  He also lamented that "it wasn't right he was being kept off his HIV meds since they had been keeping him alive for the past 10 years and keeping his symptoms and low blood count from claiming him as a victim of AIDS."

At this point, Cichon purportedly made a statement that constitutes the key fact in dispute in Leavitt's case against him. He said, "We don't give away [HIV] medications here at this jail[,] because the jail is so small and we are not equipped financially to hold the burden of providing expensive medication"; "[you will]

---

[2] Leavitt's Statement of Material Facts raises a few allegations pertaining to events that took place before the October 5 meeting, including an allegation that a jail officer refused to accept the HIV medications that a friend brought to YCJ for Leavitt.  There is nothing in the record to suggest that Cichon knew of these events, and thus they are immaterial to the determination of whether Cichon was deliberately indifferent to Leavitt's medical needs.

have to wait until you [get] to the Maine State Prison where they are able to pay for these medications." Additionally, Cichon allegedly advised Leavitt, "You don't need to stay on the [HIV] medications to be healthy, and just as soon as you get to the [MSP] they'll fix you right up."

At the time of their meeting, Cichon knew that Leavitt had been without his HIV medications for at least one month, as appellant had been incarcerated since September. Patients who take a break from antiretroviral therapy may become resistant to one or more of the drugs used as part of the regimen. Cichon thus informed Leavitt that he could not reinstate his HIV medications or refer him to an infectious disease specialist without first acquiring his medical history, information about his medications and compliance with taking those medications, and blood test results for his current CD4 cell count and viral load.[3] There is no dispute that this was the proper response to a request for restarting antiretroviral treatment.

---

[3] The parties state that the CD4 cell count is the best estimate of an HIV-positive individual's risk of short-term progression to develop the clinical symptoms and risks of complications of HIV. Viral load, which measures the amount of virus present in the bloodstream, is most helpful in assessing a patient's response to treatment, but is also generally helpful in assessing the risk of short-term progression of HIV. A higher CD4 count and lower viral load are generally desirable.

## 2. After Leavitt's Clinic Visit

Cichon directed the ARCH nursing staff to obtain Leavitt's medical records from the various facilities where he had been treated for HIV. Cichon also ordered lab work to determine Leavitt's complete blood count differential, CD4 cell count, and viral load. These labs, like all tests and medications prescribed for inmates, were paid for by YCJ.

In short order, Leavitt's medical records from the Androscoggin County Jail (ACJ), Cumberland County Jail, and Positive Health Care were faxed to YCJ, where they were reviewed and initialed by Cichon. The records indicated that Leavitt had a long history of HIV and that he previously had been prescribed the antiretroviral drugs Truvada and Kaletra. The records also established that Leavitt's labs on April 6, 2006 had shown an undetectable viral load of less than 75 and an abnormally low CD4 cell count of 355. Moreover, they showed that at the time of Leavitt's incarceration at ACJ on July 11, 2006, his medical condition was normal and he did not complain of fatigue, night sweats, or any objective symptoms of HIV. Finally, the records disclosed that Leavitt had a history of alcohol abuse that may have impeded his compliance with antiretroviral therapy, and that Leavitt had been at various points non-compliant with taking his HIV medications. Although Leavitt concedes the veracity of these

records, he insists he had been taking his HIV medications "on a regular basis" before he entered YCJ.

The lab reports from the blood work Cichon ordered were addressed to him and routed to the medical office at YCJ, where in the ordinary course of business they would have been placed on a clipboard and reviewed by Cichon each time he visited the jail. The CD4 cell count report indicated that Leavitt had a lower than normal count of 415 and noted that the "[m]ild decrease in CD4 level and increase in CD8 subset" was "indicative of immunodeficiency state and/or recent viral infection." Cichon claims no recollection of seeing these results, but acknowledges that his initial appears on the first page of the lab report, which would signal that he had reviewed them.[4]

The viral load report indicated a higher than normal viral load of 143,000. Cichon also claims not to have seen this report; the copy of it subpoenaed from YCJ and entered into the record does not bear his initial. He asserts that this is the first time in seventeen years that an omission of this type occurred, that he would have considered a viral load of 143,000 to be higher "than [he] would like to see it," and that he would have "move[d] precipitously" to refer Leavitt to an infectious disease specialist if he had reviewed the report. Cichon understood that

---

[4] Leavitt's medical records from ACJ and the CD4 cell count and viral load reports were subpoenaed from YCJ and entered into the summary judgment record as part of Cichon's affidavit.

HIV is a serious and potentially life-threatening medical condition.

3. The Remainder of Leavitt's Stay at YCJ

It is undisputed that during the four months between the October 5 clinic appointment and Leavitt's transfer to MSP, Cichon never saw Leavitt again, did not refer Leavitt to a specialist, or take any other steps to follow up on Leavitt's HIV condition. Leavitt did not see an infectious disease specialist or restart antiretroviral treatment for his HIV while at YCJ.

Although appellant was aware that the method for requesting medical treatment or medications at YCJ was to file an Inmate Medical Request Form (IMRF), he did not submit one related to treatment for HIV or HIV-related symptoms.[5] Leavitt did, however, write one or more letters to YCJ's medical department, including one to Cichon, requesting the resumption of his HIV medications. He submitted these letters to a YCJ officer at some point prior to his appointment with Cichon.

Symptoms of HIV include fevers, night sweats, loss of appetite, weight loss, wasting syndrome, chronic diarrhea, thrush, leukoplakia (a white, film-like protrusion on the lateral side of the tongue), psoriasis, and seborrheic dermatitis. During the period of his incarceration at YCJ, Leavitt suffered from night

---

[5] Leavitt filed three non-HIV-related IMRFs, in which he requested Fixadent for his dentures and cream to treat his psoriasis. Cichon denied all three requests.

sweats, chills, fever, fatigue, psoriasis, nausea, and gastrointestinal problems, including vomiting and constipation.

4. ARCH's Contractual Relationship with YCJ

In addition to serving as president of ARCH, Cichon was also its largest shareholder, with ownership of over a quarter of its stock. Cichon testified at his deposition that YCJ put its healthcare services contract out for bid every two years, that beginning November 2004 ARCH had a two-year contract with YCJ with the possibility of extensions, and that such extensions were dependent on whether YCJ was "happy with [ARCH]."[6] Cichon also testified that ARCH eventually lost the YCJ contract to CMS in June 2009 because YCJ "perceived that there [would be] a cost savings there."

5. Cichon's Professional Record

Cichon was given several "letters of guidance" by the Maine State Board of Licensure in Medicine ("Medical Board") for various infractions involving other patients that happened around the time of Leavitt's incarceration. These infractions included changing the frequency of dosage of a medication for another patient without first informing the patient,[7] as well as

_____

[6] YCJ had previously contracted with ARCH for healthcare services from around 1996 to 2003. ARCH was then replaced by the University of New England, before regaining the contract in 2004.

[7] The frequency of medications was changed from the physician's prescription of four times a day to two times a day because the jail contracted for staff to distribute medications

-10-

withholding medications from a patient with a chronic health condition "without appropriate evaluation" and "with no clear reason that the patient could not receive them."[8]  Moreover, the Medical Board suspended Cichon's physician assistant license for ninety days as a sanction for his providing medical services without a licensed supervisory physician.[9]  Subsequently, Cichon also entered into a consent agreement with the Maine Board of Osteopathic Licensure in January 2008, in which he admitted to, among other things, the violations of his physician assistant's license for which he was disciplined by the Medical Board.  Under the terms of the consent agreement, Cichon's license to practice was subject to a number of probationary conditions, including heightened supervision and reporting requirements.

---

only twice a day.  The Board found that Cichon should have informed the inmate; however, it concluded that because Cichon had consulted with the inmate's physician before implementing the change, his "behavior did not rise to a level of misconduct sufficient to warrant disciplinary action."

[8] The other letters of guidance issued by the Board related to Cichon making inappropriate comments about race and sex to patients.

[9] The Medical Board concluded that Cichon was "providing medical services as a physician assistant without having a supervisory [allopathic] physician" licensed by the Medical Board, "failing to notify the Medical Board that he no longer had a supervisory physician licensed by the Medical Board," and/or "misrepresenting to Medical Board staff the status of his license and supervisory relationship" for the period from November 2, 2006, to at least March 15, 2007.

**B. Leavitt's Treatment at MSP**

On February 17, 2007, Leavitt transferred from YCJ to MSP. By contract, CMS provides medical care at MSP, as well as some other facilities operated by the Maine Department of Corrections (MDOC). CMS employed the four other individual defendants involved in this appeal: Dr. Todd Tritch as the Regional Medical Director of CMS in Maine; Edie Woodward, a physician assistant, and Charlene Watkins, a family practitioner nurse, as healthcare providers at MSP; and Teresa Kesteloot as the Health Services Administrator at MSP.

Since MSP's medical department operates on a clinic model, patients are usually not followed by particular providers. Inmates with chronic diseases, including HIV, are assigned to the chronic care clinic, in which they are seen typically at three-month intervals.

1. Leavitt's Initial Treatment at MSP

Leavitt's first clinical interaction at MSP came in the form of an intake appointment with a CMS-employed physician assistant three days after his transfer. At this time, Leavitt said he was HIV-positive and asked to resume antiretroviral treatment. The physician assistant ordered a new round of blood tests and requested Leavitt's treatment records. Leavitt's labs were subsequently drawn and reported, showing an abnormal CD4 cell

count of 460 and an elevated viral load over 97,000.[10] The physician assistant also ordered an appointment "ASAP" with an infectious disease specialist. Generally, CMS providers use the term "ASAP" when there is some degree of concern about a patient's health. Nevertheless, the follow-up with the specialist never took place.

About one month later, another CMS provider wrote an order that Leavitt be "referred to an infectious disease doctor for starting HIV medications." That order, and all requests to refer patients to outside consultations, had to be approved by defendant Tritch.

2. Leavitt's First Consultation with Specialists

With Tritch's approval, appellant was examined in May 2007 by a team of HIV specialists at the Virology Treatment Center (VTC) in Portland, Maine. At that time, Leavitt again requested to be reinstated on his HIV medications. VTC sent a consultation report to CMS, which stated, "HIV: No urgent indication for . . . rx with CD4 at 460," meaning that Leavitt then had a good buffer in his immunological reserve to protect him from opportunistic infections or other consequences of HIV/AIDS.[11] VTC's medical

---

[10] Although this CD4 count represents a slight improvement over the reported results from April and October 2006, Leavitt's expert represents that there can be a lag in CD4 count decline after antiretroviral therapy is discontinued.

[11] VTC's medical director represented that by "[n]o urgent indication," he anticipated that a follow-up appointment or another

director subsequently explained that he decided to defer reinitiating antiretroviral treatment so that he could obtain additional information about Leavitt's immune status, viral load, medication history, and previous drug resistance testing. His decision also relied on Department of Health and Human Services (DHHS) guidelines recommending the deferral of antiretroviral treatment for patients with CD4 cell counts above 350 who did not have an AIDS-defining illness or severe symptoms of HIV infection.[12] The consultation report recommended that Leavitt return for a follow-up appointment in four to six weeks. At the end of May 2007, a CMS provider noted VTC's recommendation and ordered a follow-up appointment for Leavitt.

3. Leavitt's Treatment in Summer and Fall of 2007

Leavitt was next seen at the chronic care clinic by CMS defendant Edie Woodward in June 2007, when she treated him for a

---

round of blood tests would take place within three months. This time frame was in accordance with usual practice to check an HIV patient's CD4 and viral load counts every three to four months as a way of monitoring the patient's condition, regardless of whether the patient is on antiretroviral therapy.

[12] These DHHS guidelines were explicitly addressed to "treatment-naive" patients -- HIV-positive patients who had never been on antiretroviral therapy. However, in 2007-2008 VTC used the same information and recommendations to guide treatment of patients who had been on medications for a time and then stopped. At the time, there was disagreement in the medical community as to the wisdom of the deferred treatment approach. Leavitt's expert testified that although Leavitt's CD4 count was above DHHS's cut-off point, Leavitt should nonetheless have been immediately restarted on antiretroviral therapy because of his history of low CD4 counts and because he suffered from hepatitis C.

rash.  Woodward assumed the follow-up appointment with VTC had been or was being scheduled, and she accordingly entered an order for "follow up with [VTC] as scheduled."

On August 10, 2007, Leavitt submitted a prison sick-call slip in which he complained: "As a result of being denied meds for HIV+ my immune system is low resulting in thrush[,] and it seems as though I'm being denied meds for that also."  That same day, Tritch examined Leavitt.  Tritch confirmed that the latter was suffering from thrush and ordered updated blood work to assess the condition of his HIV.  Tritch also submitted an order for Leavitt to return for a follow-up visit specifically with him the next month.  That appointment, however, was not scheduled as Tritch ordered, and it never took place.

The results from the lab tests Tritch ordered reported that Leavitt's CD4 cell count had fallen to 424 and that his viral load had risen to greater than 100,000.[13]  It was not until November, however, that Tritch, without having seen Leavitt again as promised, approved Leavitt's referral to VTC.

In the interim, Leavitt saw Woodward at the chronic care clinic on September 1 and October 22, 2007.  At the September clinic, Leavitt complained of a rash on his underarms, fatigue, and

---

[13] In responding to a complaint to the Medical Board brought against him by Leavitt, Tritch stated that Leavitt's "HIV viral load was undetectable" as of August 2007.  Tritch has never corrected this inaccurate assertion to the Board.

white, cracked, and painful toes -- all symptoms she recognized could have been attributable to HIV. Woodward prescribed an antifungal cream for Leavitt's skin and feet. Even though she knew that the one-month follow-up consultation recommended by VTC in May never occurred, she did not determine why the appointment did not take place or take any steps to expedite the process.

At the October clinic, Leavitt complained of intermittent thrush and a rash. He again requested HIV and hepatitis C treatment. Woodward ordered various medications to treat his immediate complaints, requested updated blood work, and put in a new order for the follow-up appointment that Leavitt was supposed to have with Tritch. She did not, however, put in a second order for the referral to VTC.

4. The December Follow-up Appointment at VTC and Its Aftermath

Leavitt did not return to VTC until December, six months after his initial consult with the specialists there. At the December appointment, Leavitt complained of fatigue and presented with symptoms, including thrush, leukoplakia, and seborrheic dermatitis, that VTC interpreted as indications of immunological decline from HIV. VTC reported to CMS that Leavitt now met the criteria for starting antiretroviral therapy for HIV, requested an updated CD4 cell count and viral load to provide a baseline for treatment, and recommended genotype testing to determine Leavitt's resistance to particular HIV medications. VTC also suggested that

-16-

Leavitt return in four to six weeks, noting that it would "likely make recommendations for therapy at that time." Later that month, Woodward reviewed these recommendations and ordered an HIV viral load, an immune function panel, and a follow-up appointment with VTC in one month.

In early January, Woodward entered an order to "add genotype" to the lab work she had requested for Leavitt the previous month. Those lab results were reported on January 18 but did not include a genotype as ordered. Apparently, Bio Reference, the lab that processed Leavitt's blood work, experienced a technical problem; in its report to CMS, it stated that it would contact the prison for additional information. There is no evidence in Leavitt's chart of any subsequent communication between Bio Reference and CMS, and Woodward did not take steps to obtain the genotype results from Bio Reference.

On January 23, 2008, Woodward observed in her progress notes that Leavitt's follow-up visit to VTC was overdue and reordered it. The next month, Woodward stopped working full time at MSP. She wrote an order in February related to Leavitt's hepatitis C treatment, but from that point forward was no longer involved in his care.

CMS defendant Charlene Watkins took over Woodward's position. Watkins first saw Leavitt on February 26, 2008, when he complained of a rash, which she knew could have been a fungal

infection and a symptom of HIV. She observed in her progress notes that Leavitt was due for a follow-up visit to VTC.

5. Leavitt's March Visit to VTC

That follow-up visit, which was scheduled for February 27, was delayed on account of bad weather, and Leavitt did not return to VTC until March 12. About a month later, Leavitt saw Watkins at the chronic care clinic, whereupon he asked her why his medications had not been restarted following his March 12 visit to VTC. It turned out that no consultation report from, or record of, that visit had been placed in his CMS file. Watkins told him that it was her fault for not sending a fax to VTC. She then promptly requested and received from VTC a faxed copy of its note from Leavitt's visit, which stated: "HIV disease: Needs to restart HIV therapy. Has been on many agents prior and likely has some resistance. Unfortunately we do not have his genotype at this time. Will need to start him back on Truvada/Kaletra now. Will recommend they obtain a CD4, [viral load,] and a genotype." VTC requested a follow-up appointment in one month.

Watkins did not start Leavitt on his medications immediately. Instead, on April 14, Watkins ordered updated blood work and a follow-up visit to VTC. The lab results indicated that his CD4 cell count had plummeted to 296 and his viral load had escalated to 297,562. Watkins reviewed these results a little over a week later, but still did not start Leavitt on antiretroviral

-18-

drugs.  Nor did she confirm if the follow-up visit to VTC had actually been scheduled.  Ultimately, Leavitt did not return to VTC until almost two and a half months later.

### 6. Leavitt's Filing of a Formal Grievance

In the intervening period, Leavitt filed a formal grievance with MDOC through CMS defendant Teresa Kesteloot, in which he protested that he was not receiving treatment for his HIV.[14] Kesteloot, who was responsible for reviewing all healthcare-related complaints brought by MSP inmates, received the grievance no later than May 1, at which point she spoke with Leavitt, reviewed a portion of his medical chart, and discussed his care with CMS nursing staff.  Kesteloot's focus in investigating Leavitt's complaint was not on trying to determine whether past treatment had been appropriate -- a determination that she was not qualified to make -- but solely on whether Leavitt's current concerns were being addressed.

In the course of her inquiry, Kesteloot learned that Leavitt had been seen recently at the chronic care clinic, and that since his last visit to VTC on March 12, labs had been drawn and a follow-up appointment had been scheduled.  She thus concluded in a

---

[14] Leavitt wrote a letter on April 1, 2007 to Kesteloot's predecessor with a similar grievance, and attached a copy of that letter to his complaint to Kesteloot.  Kesteloot became aware of the April 1 letter at some point after she assumed her position, but does not know if her predecessor ever acted on Leavitt's first complaint.

memorandum to her MDOC supervisors that Leavitt "appears to have been followed appropriately."[15]  She took no additional steps to investigate whether the delay in Leavitt's treatment was part of a broader problem in the care of HIV-positive inmates at MSP or to follow up on Leavitt to ensure that there would be no further delays in his treatment.

7. The Reinitiation of Leavitt's HIV Treatment

Leavitt finally saw the VTC specialists again on June 25. VTC subsequently sent a consultation report to CMS in which it observed that Leavitt was "close to AIDS," that he had thrush on his tongue and swollen nodes on his neck, and that he needed to "start HIV antiviral meds ASAP."  The next day, Tritch, who had not seen Leavitt for over ten months, reviewed Leavitt's chart and concluded that his HIV medications should have been started sooner. He then prescribed him Kaletra and Truvada.

Leavitt finally restarted antiretroviral therapy on July 7, 2008, over seven months after VTC deemed him eligible under the DHHS guidelines.  During the seventeen months he had been incarcerated at MSP, Leavitt on three occasions submitted sick-call

_____

[15] MSP's grievance review officer reviewed Kesteloot's memo and denied Leavitt's grievance.  Leavitt's appeal of that decision to MSP's chief administrative officer was also denied.

slips to the MDOC expressly for HIV,[16] and on thirteen occasions submitted sick-call slips for thrush, rashes, or diarrhea.[17]

**C. Leavitt's Current Health and Prognosis**

After Leavitt started antiretroviral medications, his thrush disappeared and he no longer experienced night sweats and chills. By July 2008, Leavitt's CD4 cell count had rebounded to 429 (from 296 in April), and by December 2008, his CD4 cell count had risen to 550, thus indicating the reconstitution of his immune system. In his labs of February 27, 2009, he dropped to a dramatically low CD4 cell count of 252. But as of June 2009, Leavitt's HIV disease was stable. Currently, he is at a healthy weight of 170 pounds. He still suffers from warts and rashes, worsening fatigue and malaise, and "great fear and uncertainty regarding his future as a result of his HIV drug interruption."

As examples of this uncertainty, Leavitt points to a 2006 study showing that patients with CD4 counts above 350 whose antiretroviral therapy was interrupted and not restarted until their CD4 count dropped to 250 experienced a significant increase in the risk of opportunistic disease or death from any cause over the course of the trial, as compared with patients who received continuous antiretroviral therapy. Leavitt also references a great

---

[16] Those slips were submitted on August 10, 2007, January 6, 2008, and July 4, 2008.

[17] These dates range from July 26, 2007, to July 4, 2008.

body of medical literature suggesting that the lower a patient's CD4 cell count is when he starts or restarts antiretroviral treatment, the lesser the expectation of long-term immunologic recovery and the greater the risk of HIV- and non-HIV-related complications over the short term. Leavitt further cites studies indicating that patients who begin treatment at lower CD4 cell counts have a greater risk of not fully reconstituting the normal numbers of CD4 subsets. His expert testified that the interruption of Leavitt's antiretroviral therapy from September 2006 to July 2008 constituted a "continuum" of harm that makes him statistically more likely to be susceptible to opportunistic infections and/or cancer in the future.

## D. Procedural History

Leavitt filed the pro se complaint underlying this case in April 2008, when his antiretroviral therapy had not yet been restarted. In that original complaint, he brought suit for money damages and injunctive relief against CMS, YCJ, MSP, and various correctional officials and healthcare providers in their individual and official capacities, alleging that their refusal to administer his HIV medications constituted violations of 42 U.S.C. § 1983 and the Americans with Disabilities Act (ADA). He later voluntarily dismissed his claims against YCJ and MSP and filed an amended complaint in October 2008, also pro se, naming as defendants only CMS, a number of its employees, various persons employed by MDOC,

-22-

and the Warden of MSP. Leavitt later filed a pro se complaint against Cichon, which the district court consolidated on December 9, 2008 with the previous complaint into what the court styled as a second amended complaint.

Leavitt eventually obtained the services of an attorney in February 2009. Seven months later, all the defendants moved for summary judgment. The magistrate judge recommended on December 31, 2009, and the district court granted on March 2, 2010, summary judgment in favor of all of the defendants, on the ground that there was insufficient evidence that defendants acted with "deliberate indifference" to Leavitt's medical needs, as required under the Supreme Court's Eighth Amendment jurisprudence.[18] On appeal, Leavitt challenges the district court's grant of summary judgment in favor of Cichon, Tritch, Woodward, Watkins, Kesteloot, and CMS.[19] The only theory that he continues to press is their liability under 42 U.S.C. § 1983 for the violation of his Eighth Amendment right against cruel and unusual punishment.[20]

---

[18] They also offered an alternative ground for granting summary judgment in favor of Cichon: that Leavitt offered "insubstantial proof of injury."

[19] The district court granted summary judgment against a variety of other defendants, including those employed by MDOC, under a separate order, from which Leavitt does not appeal.

[20] Leavitt no longer pursues his ADA claim against any of the defendants.

## II.

### A. Standard of Review

We review a district court's summary judgment ruling de novo. Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 161 (1st Cir. 2006). Although a "state-of-mind issue such as the existence of deliberate indifference usually presents a jury question," Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991), "a party against whom summary judgment is sought is [not] entitled to a trial simply because he has asserted a cause of action to which state of mind is a material element," Hahn v. Sargent, 523 F.2d 461, 468 (1st Cir. 1975). The non-moving party must present competent evidence that shows a genuine issue for trial. Ruiz-Rosa v. Rullán, 485 F.3d 150, 156 (1st Cir. 2007).

### B. Analysis

"The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones"; accordingly, "it is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'"[21]   Farmer v. Brennan, 511 U.S. 825, 832

---

[21] The record is unclear as to whether Leavitt was being held at YCJ as a probation violator or as a pre-trial detainee, but Leavitt's precise status makes no difference to our analysis, as "the standard applied under the Fourteenth Amendment [governing the claims of pre-trial detainees] is the same as the Eighth Amendment

-24-

(1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981); Helling v. McKinney, 509 U.S. 25, 31 (1993)). The failure of correctional officials to provide inmates with adequate medical care may offend the Eighth Amendment if their "acts or omissions [are] sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976).

To succeed on an Eighth Amendment claim based on inadequate or delayed medical care, a plaintiff must satisfy both a subjective and objective inquiry: he must show first, "that prison officials possessed a sufficiently culpable state of mind, namely one of 'deliberate indifference' to an inmate's health or safety," and second, that the deprivation alleged was "objectively, sufficiently serious." Burrell, 307 F.3d at 8.

For the subjective inquiry, the Supreme Court has specified that deliberate indifference requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer 511 U.S. at 837; see also Ruiz-Rosa, 485 F.3d at 156. The standard encompasses a "narrow band of conduct": subpar care amounting to negligence or even malpractice does not give rise to a constitutional claim, Feeney, 464 F.3d at

_____

standard [governing the claims of convicted inmates]." Ruiz-Rosa, 485 F.3d at 155.

162; rather, the treatment provided must have been so inadequate as "to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind,'" Estelle, 429 U.S. at 105-06; see also Alsina-Ortiz v. Laboy, 400 F.3d 77, 82 (1st Cir. 2005) ("Willful blindness and deliberate indifference are not mere negligence; these concepts are directed at a form of scienter in which the official culpably ignores or turns away from what is otherwise apparent."). We have concluded that "[d]eliberate indifference in this context may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with 'actual knowledge of impending harm, easily preventable.'" Ruiz-Rosa, 485 F.3d at 156 (citing Feeney, 464 F.3d at 162 (quoting Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993))).

As to the second inquiry, that of a "serious" deprivation or medical need, we have held that "[a] medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990). "The 'seriousness' of an inmate's needs may also be determined by reference to the effect of the delay of treatment." Id. (citing Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987)). We note that "the subjective

deliberate indifference inquiry may overlap with the objective serious medical need determination"; "[s]imilar evidence, including evidence of adverse effects, may be relevant to both components." Smith v. Carpenter, 316 F.3d 178, 187 n. 12 (2d Cir. 2003) (citing DesRosiers v. Moran, 949 F.2d 15, 18-19 (1st Cir. 1990)).

### 1. Leavitt's Claim Against Cichon

#### a. Deliberate Indifference

Leavitt argues that Cichon's failure to refer him to an infectious disease specialist or to otherwise treat his HIV in a timely manner constitutes deliberate indifference to his serious medical needs. The cornerstone of his claim is the missed viral load report. That Cichon missed this report and neglected to follow up is at a minimum sub-optimal, perhaps even negligent. Cichon acknowledges that his failure to account for the report was "unfortunate" and that a referral to a specialist ought to have been made. But carelessness or inadvertence falls short of the Eighth Amendment standard of deliberate indifference. See Feeney, 464 F.3d at 162; cf. Montgomery v. Pinchak, 294 F.3d 492, 500 (3d Cir. 2002) ("[T]he mere loss . . . of . . . medical records does not rise to the requisite level of deliberate indifference."). To survive summary judgment, Leavitt must present enough evidence for a factfinder to conclude that Cichon ignored the viral load report, either intentionally or recklessly, "'not in the tort law sense but in the appreciably stricter criminal-law sense, requiring actual

-27-

knowledge of impending harm, easily preventable.'" Feeney, 464 F.3d at 162 (quoting Watson, 984 F.2d at 540).

It is undisputed that Cichon knew that Leavitt suffered from HIV, a medical condition that the physician assistant understood was serious and potentially life-threatening if left untreated; that Leavitt had not had access to his prescribed antiretroviral regimen for at least a month, if not longer, by the time he was seen at the clinic; and that Leavitt's CD4 count was abnormally low the last two times he was tested, in April and October 2006.[22] According to Leavitt, he had also complained to Cichon about an array of symptoms, including night sweats, chills, fever, and nausea, and told the physician assistant that he needed his antiretroviral drugs to keep him alive. A jury could thus reasonably infer that Cichon was aware that Leavitt's health was at risk. See Ruiz-Rosa, 485 F.3d at 157.

A jury could further infer that Cichon had a financial interest in not confirming that the risk was imminent and, hence, that Cichon required immediate treatment. See Farmer, 511 U.S. at 843 n.8 (noting that a prison official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm

_____

[22] Even though Cichon claims not to recollect seeing Leavitt's October 2006 CD4 test report, it is undisputed that he initialed it. Moreover, it is undisputed that he reviewed Leavitt's records from ACJ, which indicated that appellant had a below-normal CD4 cell count of 355 as recently as April 2006.

-28-

inferences of risk that he strongly suspected to exist"); see also Mata v. Saiz, 427 F.3d 745, 752 (10th Cir. 2005) (reiterating the above rule from Farmer and noting that "this level of intent can be demonstrated through circumstantial evidence").  After all, Cichon purportedly said to Leavitt that he would not provide him with HIV medications because they are too costly.  Moreover, as the president of ARCH and its largest shareholder, Cichon had a financial stake in keeping treatment and referral costs low to satisfy CMS and to remain competitive against other contractors. Cichon testified that ARCH had a two-year contract with the jail with the possibility of extensions and that the renewal of ARCH's contract depended on keeping YCJ "happy."  He also testified that in June 2009 ARCH lost the contract to CMS because of the "cost savings" that the latter apparently provided.

As further support for his theory, Leavitt points out that Cichon had been admonished by the state medical licensing authorities for unprofessional conduct that could be interpreted as evidence of his desire to lower the costs of medical care at YCJ. The Medical Board found that he withheld medications from a patient with a chronic health condition "without appropriate evaluation" and "with no clear reason that the patient could not receive them." He also changed the frequency of dosage of medication for another patient from four to two times a day because the jail contracted for staff to distribute medications only twice a day.  Furthermore,

-29-

he provided medical care without a supervising physician -- a contractor for whom ARCH presumably would have had to pay.

Finally, Cichon stated that in seventeen years, he had never neglected to review any other patient report. Given the evidence of Cichon's financial interest in minimizing costs, including his own explicit statement to that effect, the past instances in which he acted allegedly to advance that interest, and the fact that he had never before missed a lab report, a reasonable jury could conclude that Cichon acted with deliberate indifference by choosing not to review the viral load report, as its results would have obliged him, in his own words, "to move precipitously" to deal with Leavitt's chronic medical condition. See Monmouth Cnty., 834 F.3d at 346 ("[W]here 'knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care,' the deliberate indifference standard has been met." (second and third alterations in original) (citation omitted) (quoting Ancata v. Prison Health Servs., 769 F.2d 700, 704 (11th Cir. 1985))); cf. Montgomery, 294 F.3d at 500 (holding that inmate stated a prima facie Eighth Amendment case, where he alleged that defendants refused to provide him with treatment for his HIV over a nine-month period despite their prior determination that the treatment was necessary).

In granting summary judgment for Cichon, the district court emphasized that even after Cichon purportedly made the

-30-

statement about not treating HIV because of cost constraints, he directed ARCH nursing staff to gather Leavitt's medical history, ordered blood tests, and reviewed Leavitt's records. This conduct, while certainly relevant to Cichon's defense, does not preclude a jury from finding that his subsequent failure to examine the viral load report and to follow up on Leavitt's condition, in combination with other evidence in the summary judgment record, added up to deliberate indifference.[23] As Leavitt suggests, Cichon may well have ordered the lab tests and medical reports simply to "paper his file" or to "lull[ Leavitt] into complacency." The district court was too quick to decide that Cichon's version was credible and Leavitt's not. This is precisely the sort of genuine and material dispute that ought to be resolved by a jury.[24] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("Credibility

---

[23] Indeed, Leavitt himself does not take issue with Cichon's decision to order the lab tests and medical history; it is undisputed that this was the proper course of action prior to restarting antiretroviral treatment.

[24] In making this credibility determination, the district court also assigned significant weight to the fact that Leavitt did not submit any IMRFs or make further complaints to the medical department about his HIV after the October clinic appointment. While a jury is free to consider this fact in determining whether Cichon acted with deliberate indifference, we do not see how Leavitt's actions would, as a matter of law, excuse Cichon's purposeful or reckless decision to ignore the viral load report or to refuse to provide Leavitt with a referral or other treatment. Cf. Wilson v. Seiter, 501 U.S. 294, 303 (1991) (emphasizing that "assuming the conduct is harmful enough to satisfy the objective component of an Eighth Amendment claim," the "wantonness" of an official's conduct depends only "upon the constraints facing the official").

-31-

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .").

### b. Serious Medical Need

"Because '[t]he objective component of an Eighth Amendment claim is . . . [necessarily] contextual' and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." Smith, 316 F.3d at 185 (alterations in original) (citation omitted) (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)). It is obvious that HIV is a serious medical condition, as the condition can be life-threatening if not properly treated. See Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004); Montgomery, 294 F.3d at 500. Nevertheless, Cichon argues that the seriousness of the underlying medical condition does not alone establish the "serious medical need" prong of the Eighth Amendment inquiry. He insists that the inquiry must be more particularized. Because Leavitt's case against Cichon is predicated on the physician assistant's failure to review and follow up on the results of the viral load test, Cichon argues that we should focus on the seriousness of the effects of this omission. See Gaudreault, 923 F.2d at 208; see also Smith, 316 F.3d at 186 ("[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the

-32-

abstract, that is relevant for Eighth Amendment purposes."); <u>Napier</u> v. <u>Madison Cnty.</u>, 238 F.3d 739, 742 (6th Cir. 2001). We conclude that even under the version of the objective inquiry that Cichon urges us to undertake, Leavitt has presented sufficient evidence to reach a jury on the issue of serious medical need.

To begin, Cichon himself concedes that if he had seen the viral load report indicating that Leavitt's viral load was 143,000, he would have found that number to be sufficiently alarming that he would have "move[d] precipitously" to refer Leavitt to a specialist. <u>Cf.</u> <u>Sealock</u> v. <u>Colo.</u>, 218 F.3d 1205, 1211-12 (10th Cir. 2000) (relying on similarly "candid testimony" to reverse a district court's entry of summary judgment in favor of a correctional healthcare provider). Leavitt presented expert testimony that if that referral had been made, he would have been put back onto his antiretroviral regimen in short order and would not have suffered the various adverse effects of untreated HIV.[25] With regard to these effects, Leavitt submitted affidavit evidence that during his incarceration at YCJ he suffered from nightsweats, chills, fevers,

---

[25] Leavitt's medical expert testified that if Leavitt had been referred to him for care in October 2006 and presented with a CD4 count of 415, he would have gathered the necessary medical information and followed up in "about a week" with the chosen treatment regimen. The expert also testified that "knowing the [HIV specialists] out there, the majority of people would have found a regimen for him and gotten him back on antiretroviral therapy" immediately because Leavitt is "not a novel patient," but "a patient with ongoing HIV disease who has a history of very low CD4 counts."

-33-

fatigue, gastrointestinal problems, including vomiting and constipation, and psoriasis -- symptoms that he attributed to his untreated HIV and to "detoxing" from the withdrawal of antiretroviral treatment.

Leavitt presented evidence that Cichon's omission not only exposed him to these short-term effects, but also led to the exacerbation of his underlying condition. Soon after Leavitt arrived at MSP, he began suffering from thrush, leukoplakia, and seborrheic dermatitis -- conditions that VTC providers interpreted as indications of immunological decline from HIV. He continues to suffer from rashes, warts, fatigue, and malaise. Leavitt also presented expert testimony that he suffered a detrimental decrease in his CD4 count because of the "continuum" of inadequate treatment he received at YCJ and MSP. See Monmouth Cnty., 834 F.2d at 347 ("[W]here denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious."). The wealth of evidence he presented also shows that he is statistically more likely to be susceptible to opportunistic infections and cancer in the future.

From this record, a factfinder could conclude that Cichon's deprivation of care subjected Leavitt to serious harm, both short-term and long-term. See Helling, 509 U.S. at 33 (holding that correctional officials may not ignore medical conditions that are "very likely to cause serious illness and needless suffering" in the

future, and that such prospective harm can be the basis of an Eighth Amendment claim, even if the inmate has "no serious current symptoms"); see also Smith, 316 F.3d at 188 (holding that "an Eighth Amendment claim may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm"). We thus conclude that Leavitt has established a material dispute as to whether Cichon acted with deliberate indifference to his serious medical needs and that the district court erred in granting summary judgment in favor of Cichon.[26]

2. Leavitt's Claims Against the Individual CMS Defendants

Leavitt also appeals the district court's grant of summary judgment on his § 1983 claim against CMS employees Tritch, Woodward, Watkins, and Kesteloot in their individual and official capacities. We focus first on the claims against these defendants in their individual capacities.

In his brief, Leavitt appears to press a mix of collective and vicarious liability theories. He alleges that "[a]ll

_____

[26] As an alternative for granting summary judgment in favor of Cichon, the district court concluded that "Leavitt has insubstantial proof of injury caused by Cichon" as required under § 1983. See Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009). Given the amount of evidence on causation and injury available in the record, this issue cannot be resolved at the summary judgment stage. See, e.g., Gayton v. McCoy, 593 F.3d 610, 624 (7th Cir. 2010) (holding that "only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation," and thus reversing the district court's entry of summary judgment in favor of a nurse on an inmate's Eighth Amendment claim).

the CMS defendants" knew he had HIV, a disease that, if left untreated, could be fatal; were aware of his active HIV symptoms; had access to his medical charts; had the ability to communicate with VTC about his care; and were working for the same employer and could communicate with each other. These allegations, he contends, coupled with the simple fact that it took over seventeen months to reinitiate his antiretroviral therapy, are enough to put the question of the defendants' deliberate indifference to a jury.

Leavitt's group liability theory may accurately reflect some deficiencies in the provision of health services at MSP. The prison's medical department operates on a clinic model. Inmates see various providers, each of whom is not charged with following a particular patient but instead attends to whoever shows up at the clinic at the time he or she is working. Regardless, this theory cannot provide the basis for recovery: "It is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions." Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999). Nor can supervisory officials, like Tritch, be held liable for the conduct of their subordinates solely under a theory of respondeat superior. Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009) (reiterating the principle that government officials may be held liable only "on the basis of their own acts or omissions," and not "for the unconstitutional conduct of their subordinates under a theory of

respondeat superior" (quoting <u>Ashcroft</u> v. <u>Iqbal</u>, 129 S. Ct. 1937, 1948 (2009))).[27]  It may be true that the care Leavitt received at MSP was generally inadequate.  However, to make out a cognizable Eighth Amendment claim against healthcare providers in their <u>individual</u> capacity, he must demonstrate that there is sufficient evidence for a reasonable factfinder to conclude that <u>each</u> CMS defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that <u>each</u> defendant did, in fact, "draw the inference."  <u>Farmer</u> 511 U.S. at 837.  We cannot conclude that Leavitt has satisfied his burden.

### a. <u>Todd Tritch</u>

Leavitt's grievance appears to be that Tritch acted with deliberate indifference in failing first to sign off on necessary referrals to specialists and second to follow up on Leavitt after committing to intervene more personally in his care.  Leavitt only insinuates the first theory, and the record simply does not bear out the latter.  Tritch did not became personally involved in Leavitt's care until August 10, 2007.[28]  After examining appellant, Tritch not

---

[27] Leavitt does not allege that any particular CMS defendant "supervise[d], train[ed], or hire[d] a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." <u>Sanchez</u>, 590 F.3d at 49 (quoting <u>Camilo-Robles</u> v. <u>Zapata</u>, 175 F.3d 41, 44 (1st Cir.1999)).

[28] Tritch approved Leavitt's referrals to outside specialists prior to August 2007, but Leavitt does not allege any specific wrongdoing on Tritch's part in dealing with referrals.

only ordered updated blood work, but also took the unusual step of ordering that Leavitt's follow-up appointment specifically be with him. While the appointment never took place, there is no evidence that this omission was anything more than an unfortunate scheduling glitch. It is undisputed that when Tritch finally saw the August lab results in November, he approved Leavitt's referral to VTC. It is also undisputed that in June 2008, it was Tritch who reviewed Leavitt's chart, concluded that his HIV medications should have been started sooner, and put in the order for antiretroviral drugs.

Based on this series of events, no reasonable factfinder could conclude that Tritch acted with deliberate indifference. To the contrary, each time he became aware of potentially serious harm to Leavitt, he reacted expeditiously. Perhaps Tritch was not as aware as one would like a medical professional to be, but "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment," let alone punishment cruel and unusual. Farmer, 511 U.S. at 838.

b. Edie Woodward and Charlene Watkins

Against Woodward and Watkins, Leavitt's allegations reduce to the theory that they ought to have been more proactive in following up on his care -- that, for example, Woodward should have pursued the results of Leavitt's genotype test when Bio Reference failed to report them, and Watkins should have taken steps to

confirm that an appointment with VTC had been scheduled as ordered. Leavitt offers nothing beyond conclusory allegations that their failure to do so was a symptom of deliberate indifference. See Ruiz-Rosa, 485 F.3d at 156 ("Allegations made in a plaintiff's complaint, standing alone, are not enough to oppose a properly supported motion for summary judgment."). The record shows that Woodward and Watkins behaved in ways consistent with their professed intention to treat Leavitt: each saw him in the chronic care clinic on myriad occasions, treated him for his immediate complaints, and ordered testing and follow-up appointments when appropriate. Certainly, they both relied on inaccurate or imperfect data in Leavitt's chart that appointments had been ordered or that follow-up phone calls would be made, but there is no evidence that their reliance was not in good faith. See Whitley v. Albers, 475 U.S. 312, 319 (1986) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."); Battista v. Clarke, __ F.3d ___, 2011 WL 1902165, at *5 (1st Cir. May 20, 2011) ("[S]o long as the balancing judgments are within the realm of reason and made in good faith, the officials' actions are not "deliberate indifference.").

With respect to Watkins, Leavitt points to one other incident as a ground for his deliberate indifference claim. He asserts that when Watkins received the consultation report from his

March appointment at VTC, stating "Will need to start him back on Truvada/Kaletra now," she should have started his antiretroviral therapy immediately. Watkins claims that because the report also recommended that "they obtain a CD4, [viral load,] and a genotype," she interpreted it to mean that Leavitt should not restart treatment until after a new round of blood tests. Even if Watkins's interpretation was incorrect, it is uncontroverted that she proceeded in accordance with that interpretation, ordering the updated lab work she thought was required before Leavitt could be put back on Truvada and Kaletra. In this context, their disagreement over the interpretation of VTC's instruction is tantamount to a dispute over the exercise of professional judgment and insufficient to support a constitutional claim. See Torraco, 923 F.2d at 234 (observing that "'[w]here the dispute concerns not the absence of help, but the choice of a certain course of treatment,'" deliberate indifference may be found [only if] the attention received is 'so clearly inadequate as to amount to a refusal to provide essential care'" (quoting Sires v. Berman, 834 F.2d 9, 13 (1st Cir. 1987); Miranda v. Munoz, 770 F.2d 255, 259 (1st Cir. 1985))); Ferranti v. Moran, 618 F.2d 888, 891 (1st Cir. 1980) (holding that "disagreement on the appropriate course of treatment . . . may present a colorable claim of negligence[] but . . . falls short of alleging a constitutional violation").

c. <u>Teresa Kesteloot</u>[29]

Leavitt takes issue with Kesteloot's failure, in investigating his May complaint, to review earlier entries in his chart, including lab results from March that indicated a low CD4 cell count and high viral load. Relatedly, Leavitt complains that Kesteloot did not look into why his antiretroviral therapy had been delayed until he filed his grievance. These allegations have little force when Leavitt himself acknowledges that Kesteloot's only focus in investigating his complaint was on whether his current concerns were being addressed, and not on whether past treatment had been appropriate. Kesteloot concluded her investigation after being satisfied that Leavitt had recently been seen by clinic providers, that his labs had just been drawn, and that a follow-up appointment with VTC was scheduled. This was a reasonable response to Leavitt's complaint. See <u>Burrell</u>, 307 F.3d at 8 ("[P]rison officials . . . cannot be deliberately indifferent if they responded reasonably to the risk, even if the harm ultimately was not avoided."). It is true that Kesteloot did not investigate whether Leavitt's treatment was evidence of a systemic problem at MSP or follow up on Leavitt to insure that there would be no further delays in his treatment.

---

[29] The CMS defendants argue that Leavitt has waived his claim against Kesteloot by failing to "separately address" that claim in his consolidated objection to the magistrate judge's recommended decisions. We need not resolve the issue of waiver; we conclude on the merits that Leavitt does not have a triable claim against Kesteloot.

However, her failure to take these affirmative steps is, without more, insufficient to allow a jury to find deliberate indifference.

### 3. Leavitt's Claims Against CMS and Its Employees in Their Official Capacities

Finally, we reach Leavitt's claims against CMS and its employees in their official capacities.  CMS concedes that as a private entity operating in its capacity at MSP at the time in question, it can be held liable as a municipality for the purpose of suits filed under § 1983.[30]  As for the CMS employees, "[a] damages suit against an official in an official capacity is tantamount to a suit against the entity of which the official is an agent."  Burrell, 307 F.3d at 7.  Thus the question is whether there is any basis for imposing liability against the entity.

An underlying constitutional tort is required to proceed under a municipal liability theory.  Where, as here, there is no constitutional violation by the employees of the municipality, there can be no liability predicated on municipal policy or custom.  See Kennedy v. Town of Billerica, 617 F.3d 520, 531-32 (1st Cir. 2010).[31]

---

[30] This circuit has not expressly held that private entities should be treated analogously to municipalities for the purpose of § 1983 liability.  Still, the parties agree that CMS may be held liable as though it were a municipality, and so we have proceeded accordingly.

[31] Having concluded that Leavitt failed to put forth sufficient evidence of the CMS defendants' deliberate indifference, we see no need to reach the issue of "serious medical need."

**III.**

Although we conclude that the record is insufficient to allow Leavitt's Eighth Amendment claims against the CMS defendants to go to a jury because of the stringent constitutional standard, we note the acknowledgment of the CMS defendants that "the care [Leavitt] received ultimately fell short of the mark." Those responsible for the operation of the Maine correctional healthcare system, including MDOC, should focus on the troubling implications of that acknowledgment.

For the reasons set forth, we vacate the district court's grant of summary judgment in favor of Cichon; affirm the grant of summary judgment in favor of CMS, Tritch, Woodward, Watkins, and Kesteloot; and remand for further proceedings consistent with this opinion. Each side shall bear its own costs on this appeal.

So ordered.