In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2012

ARBOLEDA ORTIZ,

*Plaintiff-Appellant,*

*v.*

THOMAS WEBSTER, DOCTOR,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 2:05-cv-00246-LJM-JMS—**Larry J. McKinney**, *Judge.*

ARGUED AUGUST 3, 2011—DECIDED AUGUST 24, 2011

Before BAUER, MANION and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.* Arboleda Ortiz, an inmate on federal death row in Terre Haute, Indiana, is before us for the second time, suing under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). He argues, as he did in his first appeal, that Dr. Thomas Webster, the prison's medical director, was deliberately indifferent to his need for eye surgery. We originally reversed the district court's grant of summary

judgment on the ground that Ortiz had established fact disputes on the seriousness of his condition and the constitutionality of Dr. Webster's delayed response. *Ortiz v. Bezy*, 281 F. App'x 594, 598-99 (7th Cir. 2008). The record changed very little on remand, yet the district court granted Dr. Webster's renewed motion for summary judgment. Because the evidence remains insufficient to eliminate the fact disputes that we previously identified, we vacate that decision and remand with instructions that the case proceed to trial.

We assume familiarity with the facts set forth in our first decision. *Ortiz*, 281 F. App'x at 595-97. Nonetheless, we summarize them here both to illustrate the dispute that has existed since Ortiz filed suit and to demonstrate how the additions to the record on remand merely make that dispute more pronounced.

Shortly after Ortiz was placed in custody in Terre Haute in 2001, a physician determined that he needed eye surgery. Ophthalmologist Jonathan McGlothan examined Ortiz and diagnosed him with pterygia, which is a thin film that covers the eye. Although the condition is often confined to the white part of the eye, Dr. McGlothan noted that it had extended over Ortiz's corneas and that his uncorrected vision was 20/80 as a result. Ortiz complained that, in addition to obscuring his vision, the pterygia caused persistent itching and irritation, and that he often felt like sandpaper was in his eye. Dr. McGlothan described the pterygia as "visually significant," prescribed glasses, and recommended excision. Six months later (but before Dr. Webster

became medical director), the prison rejected the request. The note "NO TOWN TRIPS" was handwritten on the recommendation.

Over the next two years, Ortiz continued to complain about his eyes. Two more doctors agreed with the original opinion that surgery was necessary, but the prison still refused the treatment. First, Dr. David George signed off on Dr. McGlothan's recommendation for surgery. Then Dr. D.W. Conner, an optometrist, observed that Ortiz's vision had deteriorated to 20/100 and that the pterygia was "causing corneal distortion." Dr. Conner therefore also recommended excision and referred Ortiz back to Dr. McGlothan for surgery. But another optometrist, Dr. Christian Radaneata, thought the condition not sufficiently serious to require surgery and instead prescribed eyedrops and a topical anti-inflammatory.

In May 2003, Dr. Webster, now the prison medical director for about a year, became personally involved in Ortiz's treatment. He reviewed the file containing the opinions of three doctors that surgery was necessary and one that it was not. Based on this information, Dr. Webster then reached his own opinion about Ortiz: with uncorrected vision of 20/100, Ortiz "may need surgery within the next two years." To determine whether Ortiz needed surgery, Dr. Webster decided that further evaluation was needed. Although Ortiz saw a specialist at times over the next two years, as far as the record shows his visual acuity was never measured, and he was not evaluated for further corneal distor-

tion despite his continued complaints of redness and irritation.

In a declaration that he furnished in this litigation, Dr. Webster explains that he refused to order surgery in this two-year period as not "medically necessary" because the doctors who had previously examined Ortiz determined that the pterygia was not affecting his vision. But the medical record that Dr. Webster says he consulted contradicts his description of the examining doctors' conclusions. Ortiz's medical file shows that all the doctors who examined him found the pterygia *had* impaired his vision (Dr. Webster himself knew in May 2003 that Ortiz's vision had deteriorated to 20/100), and the majority of specialists added that it had encroached on the visual axes of his eyes.

Ortiz filed this suit two years later, in 2005, to obtain the surgery and damages for the delay. Over the next three years, with three more specialists urging excision (beyond the three doctors who had recommended it starting in 2001), Ortiz received surgery in stages. In July 2006, on Dr. Webster's request, Ortiz saw an optometrist who noted that the pterygia was continuing to encroach on Ortiz's corneas (as it had been for years) and recommended surgery. Ortiz then went to an ophthalmologist, Dr. Padma Ponugoti, who noted that the pterygia was causing irritation and needed to be removed. A few months later Dr. Ponugoti performed surgery on Ortiz's left eye. The follow-up that Dr. Ponugoti ordered, however, including similar surgical treatment of Ortiz's right eye, was delayed for over a year. Ortiz finally saw

Dr. Robert Deitch in March 2008, and he recommended that the pterygia in Ortiz's right eye be removed and that he undergo an additional procedure in both eyes to prevent it from returning. The prison rejected that recommendation in May 2008, but Ortiz got the surgery in June 2008, two weeks after our initial remand.

In this lawsuit, Ortiz asserts that delay in his treatment was based on deliberate disregard of his documented medical needs. He attributes the indifference to an unofficial prison policy of denying off-site medical care based on an inmate's death-row status. As circumstantial evidence of this policy, he points to the "NO TOWN TRIP" notation on his chart and to affidavits from other death-row inmates attesting that neither they nor anyone they knew left the facility for medical care between 2001 and 2005.

In our initial decision, we rejected the district court's grant of summary judgment, identifying two genuine fact disputes. We first noted that, "because most of the doctors—including specialists—who examined Ortiz recommended surgery," there was a fact question as to the seriousness of Ortiz's condition. *Ortiz*, 281 F. App'x at 598. Second, we explained that the rationale Dr. Webster advanced during the litigation for denying surgery (Ortiz's vision was not impaired) was an inaccurate representation of the medical record that he had consulted; we concluded that this gap in reasoning created a fact dispute on the motivation behind Dr. Webster's prolonged refusal to provide surgery. *Id.* As for the "NO TOWN TRIP" note, we described it as "unex-

plained" and said that, viewed in Ortiz's favor, it added to the facts already in dispute on deliberate indifference. *Id.*

On remand, Dr. Webster added two notable items of evidence. First, he explained the "NO TOWN TRIP" notation in a supplemental affidavit and with a declaration from Debi Lamping, its author. Lamping attested that she made the notation on Ortiz's chart after the initial surgery request was denied and that she merely meant that outside medical care, a "town trip," had been denied for Ortiz. She denied knowledge of a policy that would foreclose off-site medical care for death-row inmates. In his own affidavit, Dr. Webster attested that some inmates had received off-site medical treatment during the relevant time period and that all inmates receive the same level of care regardless of their security status.

The other piece of new evidence came in the form of an expert opinion supplied by Dr. Raj Maturi, a non-treating ophthalmologist. He opined that surgical removal of pterygia "is generally an elective procedure" that does not become necessary "until corneal distortion occurs." He added that, in his view, Dr. Webster's treatment for Ortiz was "within the standard of care at all times" because the pterygia was "mild" and did not require excision until 2006 when Ortiz's vision "dropped" to 20/80 without correction. Instead, Dr. Maturi concluded that the doctors who had recommended surgery acted outside of the standard of care because they did not attempt to treat the condition with "medical

intervention" (eyedrops) first. That treatment, Dr. Maturi concluded, was sufficient to respond to Ortiz's condition.

The district court considered this new evidence and again granted Dr. Webster's motion for summary judgment. The court concluded that Ortiz's pterygia "certainly reached the stage of a serious medical condition," but it repeated its initial conclusion that "at best" the evidence illustrated a difference of opinion about the proper course of treatment.

Ortiz argues on appeal that the district court misconstrued his case as reflecting a mere difference of opinion between alternative, equally valid courses of treatment. Instead, he maintains, the evidence viewed in his favor shows that Dr. Webster deliberately or recklessly delayed in providing him with necessary care for a serious medical condition. Ortiz also contends that from 2001 to 2005 the prison implemented an unconstitutional policy of forbidding death-row inmates from receiving off-site medical care. Dr. Webster denies that Ortiz's pterygia was "objectively serious" and argues that, even if serious, a jury could not conclude that he consciously disregarded it. He relies heavily on Dr. Maturi's opinion that Ortiz received treatment within the standard of care, but he also maintains that his case doesn't turn on Dr. Maturi's view because Ortiz has merely shown that doctors disagree about how to treat pterygia. Finally, Dr. Webster characterizes the "NO TOWN TRIP" notation as mundane shorthand that, when viewed in context, is not evidence of an unconstitutional policy of denying off-site medical care to all death-row inmates.

To survive summary judgment on his claim of deliberate indifference, Ortiz needed to provide evidence that his pterygia constituted an objectively serious medical condition and that Dr. Webster was aware of the condition and knowingly disregarded it. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). Dr. Webster argues that the objective element of this standard is not satisfied, but that contention can easily be rejected. Although pterygia can be treated without surgery unless it begins to interfere with a patient's vision, it falls into the category of objectively serious once it becomes obvious to a layperson or "has been diagnosed by a physician as mandating treatment." *See Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (internal citation and quotation marks omitted). Here, the pterygia was interfering with Ortiz's vision, and most doctors who examined him recommended surgery and all prescribed some form of treatment. At a minimum, those recommendations are enough to create a genuine fact dispute that his pterygia had become objectively serious.

The real issue, then, is whether Dr. Webster intentionally or with deliberate indifference ignored the condition. The evidence here, when viewed in Ortiz's favor, is sufficient for a jury to conclude that he did. Dr. Webster relies heavily on Dr. Maturi's affidavit, but we don't think his opinion helps Dr. Webster's case. Dr. Maturi opines that, in general, excision of pterygia is unnecessary unless the patient's uncorrected vision is 20/80 and the pterygia encroaches on the patient's corneal axis. Construing the record in Ortiz's favor, Dr. Webster knew (or

recklessly failed to know) that those conditions existed by 2003, when he first examined Ortiz's file. By that time Dr. McGlothan had observed (two years earlier) that Ortiz's vision without glasses *was* 20/80, and Dr. Conner reported that Ortiz *did* suffer from corneal distortion in 2003. If anything, Dr. Maturi's opinion supports Ortiz's contention that he needed surgery and casts doubt on the lone opinion to the contrary.

Moreover, we disagree with the district court that this case is like those involving a mere difference of opinion among physicians on how an inmate should be treated, which can defeat a claim of deliberate indifference. *See, e.g., Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001). Here, Dr. Webster ignored his own conclusions in 2003, which no other expert, including Dr. Maturi, has questioned. At that time, Dr. Webster knew that three specialists previously advised surgery and one specialist disagreed. As a result, Dr. Webster concluded that with 20/100 vision, Ortiz "may need surgery within the next two years" depending on the results of a further evaluation. But Ortiz never received another measurement of his visual acuity in that time. We acknowledge that Ortiz was not completely ignored during this period, but he received nothing more than eyedrops. Furthermore, the record suggests that the medical providers he saw never measured his visual deterioration or corneal distortion. These are the two factors that Dr. Maturi tells us are critical to assessing the need for surgery to treat pterygia. Had the evaluations of those factors that took place in 2006 (which confirmed 20/100 eyesight and

corneal distortion) occurred earlier, when Dr. Webster himself thought necessary, these factors would have again corroborated that Ortiz met the criteria for surgery.

The problem with Dr. Webster's inaction, then, is not that he chose the wrong side in a medical debate. He ignored his own opinion, undisputed in this record, that within two years of 2003 Ortiz required either further evaluation of his vision acuity or surgery. Physicians cannot escape liability simply by "refusing to verify underlying facts" regarding the potential need for treatment. *Farmer*, 511 U.S. at 843 n.8; *see Leavitt v. Corr. Med. Servs., Inc.*, No. 10-1432, 2011 WL 2557009, at *10-11 (1st Cir. June 29, 2011). Because the evidence would permit a jury to conclude that Dr. Webster's inaction substantially and unreasonably delayed necessary treatment, Ortiz has done enough to survive summary judgment on his claim of deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010); *Gayton v. McCoy*, 593 F.3d 610, 625 (7th Cir. 2010); *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008); *Jones v. Simek*, 193 F.3d 485, 490-91 (7th Cir. 1999).

Even if we ignored that Dr. Maturi's reasoning actually confirms that Ortiz needed surgery in 2003 and considered only that doctor's "bottom line" that surgery was never necessary (which is not how a court should treat an expert's opinion, *see Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)), Dr. Maturi's affidavit merely highlights what we found in genuine dispute in our prior decision. Setting aside Dr. Webster, the record construed in Ortiz's favor now contains six

specialists who recommended surgery and two who concluded that it was unnecessary. Both the dispute about the need for surgery and Dr. Webster's own failure to resolve the issue through the further evaluation that he himself considered necessary were evident in the record before we remanded the case. The addition of a non-treating doctor claiming surgery was unnecessary does not eliminate the dispute. *See Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) (explaining that "the sheer number of witnesses mustered by each side is not a relevant consideration" for deciding motions for summary judgment). Because we previously identified a fact dispute over whether the extended delay in Ortiz's treatment amounted to deliberate indifference and because Dr. Maturi's opinion fails to resolve that dispute, we remand for trial.

There is, however, one last issue that warrants our attention. Throughout this litigation Ortiz has asserted a broader contention that the "NO TOWN TRIP" notation suggested a policy of refusing to treat all death-row inmates off-site. Both the notation's author and Dr. Webster have now provided an innocuous explanation, and Ortiz failed to present any evidence to undermine it. Dr. Webster even attested that there were death-row inmates who *did* leave the prison for medical treatment during the time in question, thus further refuting Ortiz's contention that no one in the unit was allowed to do so. Because Dr. Webster offered both an explanation for the notation and examples that undermined the contention, Ortiz may use the "NO TOWN TRIP" notation, at most, to support his claim of

deliberate indifference. He may not proceed with a separate contention that the prison denied death-row inmates off-site treatment.

Accordingly, we VACATE the opinion of the district court and REMAND with instructions that the case proceed to trial.

KANNE, *Circuit Judge,* dissenting. I agree with the majority's opinion insofar as it forecloses Ortiz's claim that there was a policy which forbade medical trips for all death-row inmates. There is no evidence of such a policy, and the majority rightly rejects this argument. I also agree that Ortiz has demonstrated that the pterygia in one of his eyes qualified as a serious medical condition. I part company with the majority, however, as to its conclusions regarding Dr. Webster's state of mind. I do not believe that the facts of this case give rise to any possibility of deliberate indifference on the part of Dr. Webster during the time period of the complaint, and would therefore affirm the grant of summary judgment in Dr. Webster's favor.

As the majority recognizes, the Eighth Amendment of the United States Constitution proscribes cruel and unusual punishment, a proscription that is violated when

prison officials display "deliberate indifference to [the] serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "Deliberate indifference" is a robust state-of-mind requirement, ensuring that "the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). Although a prisoner need not show that the official intended the harm that occurred to surmount this requirement, circumstances that suggest negligence—or even gross negligence—by the official are insufficient to establish a constitutional violation. *Estelle*, 429 U.S. at 106; *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). Rather, deliberate indifference exists only if the official was aware of the condition and actually drew an inference that substantial harm would result if the condition was ignored or improperly addressed. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

Proving deliberate indifference in the medical context is especially difficult, as the boundaries of reasonable treatment are broad. Doctors, like jurists, often disagree about what constitutes the "correct" result. Some doctors prefer more conservative treatment, engaging in surgical intervention only as a last resort, while other doctors utilize a more aggressive approach, deploying surgery before trying less invasive methods that they believe will be ineffectual. In many situations, both approaches to treatment would be "reasonable," and a reasonable response to a medical risk—even if the harm was ultimately not averted—can never constitute deliberate

indifference. *Peate*, 294 F.3d at 882. Even in those situa-tions where one approach is reasonable and the other is not, a "difference of opinion among physicians on how an inmate should be treated" generally suggests—at worst—a negligent state of mind, as the doctor's mis-taken belief that his treatment will succeed vitiates any possibility of deliberate indifference. *See Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Keeping these principles in mind, I turn to Ortiz's claim. The majority points to two instances of possible deliberate indifference: Dr. Webster's decision in 2003 not to approve surgery, and Dr. Webster's follow-up care between 2003 and late 2005. The majority discerns enough evidence of deliberate indifference at both points, but I remain convinced that Dr. Webster's conduct evinces no more—and perhaps less—than a negligent state of mind.

The majority focuses first on Dr. Webster's initial deci-sion to ignore some of the recommendations for surgical excision. The eye experts consulting at the prison came to dueling conclusions regarding Ortiz's care: a number thought that surgery was necessary, but one, Dr. Radaneata, concluded that Ortiz did not yet need an excision because his condition could be managed with eyedrops. When Dr. Webster started at the prison in 2003, he reviewed Ortiz's file and sided with the expert who preferred less invasive treatment, concluding that surgery *might* be necessary in the future but was not yet needed. Despite Dr. Webster's reliance on a special-ist's opinion, the majority suggests that a jury could

reasonably conclude that Dr. Webster knew or recklessly failed to know that Ortiz's symptoms warranted surgery during his initial review. *Ante* at 8-9. On the contrary, I see nothing that would permit a jury to discern reckless-ness on the part of Dr. Webster at that point. Perhaps if the treatment for Ortiz's diagnosis was clear and there was no way any physician would view the dissenting specialist as providing a reasonable recommendation, there would be enough for a jury to find recklessness. *See, e.g., Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996) ("If the symptoms plainly called for a particular medical treatment—the leg is broken, so it must be set; the person is not breathing, so CPR must be administered—a doctor's deliberate decision not to furnish the treat-ment might be actionable . . . ."). But treatment for pterygia is not clear-cut—especially to a non-specialist like Dr. Webster—and I cannot fathom why Dr. Webster's decision to credit one eye expert over another at the time of his review points to anything more than negligence. *See Norfleet*, 439 F.3d at 396; *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 262 (7th Cir. 1996).

Nor do I believe that Dr. Webster's follow-up care was constitutionally deficient. The majority concludes that Dr. Webster was possibly deliberately indifferent because he "ignored his own conclusions in 2003" regard-ing the need for and scope of follow-up care. *Ante* at 9. But Dr. Webster did not ignore his own follow-up or-ders. Those orders, contrary to the majority's asser-tions, *ante* at 9-10, recommended *only* that Ortiz see a specialist for follow-up; they said nothing about the types of tests that should be ordered. And that recommenda-

tion was followed. In 2004, after Dr. Webster's initial review, Ortiz was evaluated by an optometrist, who concluded that excision was still unnecessary despite tissue encroachment into the eye. Ortiz was also issued a prescription for eyeglasses around that time, meaning that his visual acuity must have been evaluated. Finally, Ortiz was seen by a number of physician assistants throughout 2004. One saw Ortiz prior to his appointment with the optometrist and noted the stage of his corneal encroachment for the optometrist's review. The other assistants saw Ortiz after his visit with the optometrist; they noted no major change in Ortiz's status since that visit and recommended Ortiz continue with noninvasive treatment. All of this shows that Ortiz was seen for follow-up in the manner originally recommended by Dr. Webster.

In light of the pre-review opinions favoring surgery, the majority also accuses Dr. Webster of "refusing to verify underlying facts" during the follow-up period. *Ante* at 10. True enough, Dr. Webster could not stick his head in the sand after his 2003 review and ignore facts that "he strongly suspected to be true." *Farmer*, 511 U.S. at 843 n.8. But even read in the light most favorable to Ortiz, the record does not suggest such intentional ignorance. Rather, the sequence of events—along with Dr. Webster's declaration—reflects that Dr. Webster relied on the 2004 follow-up by the optometrist (and Ortiz's subsequent silence) to conclude that surgery remained unnecessary. Now, perhaps Dr. Webster's decision to rely on that optometrist's recommendation was a misjudgment— parts of the non-treating expert's opinion suggested as

much, and doctors who evaluated Ortiz in 2006 noted that he needed surgery on at least one of his eyes. But a clinical misjudgment is generally insufficient to establish a deliberately indifferent state of mind. *See Duckworth v. Ahmad*, 532 F.3d 675, 680 (7th Cir. 2008); *see also Foelker v. Outagamie County*, 394 F.3d 510, 515 (7th Cir. 2005) (Manion, J., dissenting). In the end, Dr. Webster's follow-up decisions reflect an honest belief that noninvasive care was adequate, leaving little opening for a jury to conclude that his conduct was deliberately indifferent.

The majority concludes by stating that "[t]he addition of a non-treating doctor claiming surgery was unnecessary does not eliminate the dispute." *Ante* at 11. But I believe that the non-treating expert's opinion closes the one tiny window left open in Ortiz's claim. We have consistently held that a difference of opinion between physicians is insufficient to create an issue of fact as to deliberate indifference, as such a disagreement would rarely be enough to establish malpractice, much less the standard imposed on Eighth Amendment claims. *See, e.g.*, *Norfleet*, 439 F.3d at 396; *Pardue*, 94 F.3d at 261. The exception to this rule is those cases where the physician's viewpoint is so unreasonable and so ridiculous as to leave open an inference that the physician acted recklessly in choosing the course of treatment he did. *Duckworth*, 532 F.3d at 680; *Steele*, 82 F.3d at 178. The non-treating expert here opined that pterygia treatment is *not* straightforward, and that many doctors reasonably believe that noninvasive medical treatment is appropriate for a significant period before surgical treatment should be initiated. The expert's uncontested opinion

went on to state that Dr. Webster's decisions were not reckless, meaning that they were not "so far afield as to allow a jury to infer deliberate indifference." *See Duckworth*, 532 F.3d at 680. That sounds the death knell for Ortiz's claim.

It is unfortunate that Ortiz has the condition he does, and I sympathize with his plight. But there is a significant gap between negligent care and deliberate indifference, and the Supreme Court has made clear that mere negligence does not an Eighth Amendment violation make. Taking the facts in the light most favorable to Ortiz, I believe a reasonable jury could infer only negligence on the part of Dr. Webster—if even that. For that reason, I respectfully dissent.